RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0046p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

KENTUCKIANS FOR THE COMMONWEALTH and
SIERRA CLUB,

　　　　　　　　　*Plaintiffs-Appellants*,

　　　　　*v.*

UNITED STATES ARMY CORPS OF ENGINEERS,
THOMAS P. BOSTICK, and LUKE T. LEONARD,
　　　　　　　　　*Defendants-Appellees*,

LEECO, INC.,

　　　　　　　　　*Intervenor-Appellee*.

No. 13-6153

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:12-cv-00682—Thomas B. Russell, District Judge.

Argued: February 11, 2014

Decided and Filed: March 7, 2014

Before: KEITH, SILER, and ROGERS, Circuit Judges.
_____

## COUNSEL

**ARGUED:** Neil Gormley, EARTHJUSTICE, Washington, D.C., for Appellants. J. David Gunter II, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Robert G. McLusky, JACKSON KELLY PLLC, Charleston, West Virginia, for Appellee Lecco. **ON BRIEF:** Neil Gormley, Jennifer C. Chavez, EARTHJUSTICE, Washington, D.C., Joseph M. Lovett, J. Michael Becher, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, Mary Cromer, APPALACHIAN CITIZENS LAW CENTER, Whitesburg, Kentucky, for Appellants. J. David Gunter II, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Robert G. McLusky, JACKSON KELLY PLLC, Charleston, West Virginia, Kevin M. McGuire, JACKSON KELLY PLLC, Lexington, Kentucky, for Appellee Leeco.

1

_____

**OPINION**

_____

ROGERS, Circuit Judge.    More than six years after the Commonwealth of Kentucky authorized a surface mining operation in Perry County, this appeal raises the issue of the proper scope of environmental analysis a federal agency must use in issuing a permit related to a small but necessary part of the operation.    The Surface Mining Control and Reclamation Act grants Kentucky "exclusive jurisdiction" over the regulation of surface mining within the state, subject to minimum federal standards.    In order to conduct surface mining in Kentucky, a mine operator must obtain a permit for the overall operation from Kentucky's Division of Mine Permits, as well as subsidiary permits related to water and stream quality, as required by the Clean Water Act.    One of these permits is a § 404 permit, which is issued by the U.S. Army Corps of Engineers and is required for the discharge of dredged or fill material into waters of the United States.    After obtaining a permit from the Division of Mine Permits, intervenor Leeco, Inc. applied for and received a § 404 permit from the Corps.    The permit authorizes Leeco to "mine through" and fill certain surface stream beds, which are already in a degraded state, and requires Leeco to offset the limited environmental effect of the filling by improving other streams in the watershed.

The plaintiffs challenge the Corps's issuance of the § 404 permit, arguing that the National Environmental Policy Act ("NEPA") requires the Corps to have considered in its environmental assessment the public health impacts related to surface mining in general, and that the Corps violated the Clean Water Act by using a flawed analysis of the associated compensatory mitigation plan.    In a comprehensive and thoughtful opinion, the district court rejected the plaintiffs' arguments.    This appeal followed. Because the Corps did not abuse its discretion in limiting the scope of its environmental analysis only to health effects closely related to the discharge of dredged or fill material into jurisdictional waters, the Corps did not violate NEPA.    And because the Corps's acceptance of Leeco's compensatory mitigation plan was not an arbitrary and capricious

exercise of its specialized expertise, the Corps did not violate its requirements under the Clean Water Act. Accordingly, we must uphold the Corps's decision to issue the § 404 permit.

We of course decide only the issues before us—whether the permit at issue in this case complies with the Clean Water Act and the National Environmental Policy Act. Our decision takes no position on the public policy questions of whether surface mining is in the larger public interest, or whether mountaintop removal should be allowed by the Commonwealth of Kentucky.

Congress passed the Surface Mining Control and Reclamation Act of 1977 ("SMCRA") in order to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). The Act set up a system of "cooperative federalism," in which state governments could opt in to regulating coal surface mining in their states so long as they establish agencies to enact and administer their own regulatory programs consistent with federal minimum standards and subject to federal approval. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289 (1981). Under the Act, a state that administers a federally approved program "assume[s] exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on non-federal lands, 30 U.S.C. § 1253(a), with limited federal oversight to ensure compliance with federal standards, *id.* § 1271. Kentucky's Department for Natural Resources has assumed legal responsibility for implementation of SMCRA through its Division of Mine Permits. *See* Ky. Rev. Stat. §§ 350.028, .465(2). This program has been approved by the U.S. Department of the Interior since 1982. 30 C.F.R. § 917.10. Thus, any surface mining operation in the Commonwealth of Kentucky must be conducted with a permit from the Division of Mine Permits. *See* 30 U.S.C. § 1256(a).

Although a SMCRA permit authorizes all of the activities related to a surface mining operation, it alone may not be sufficient to allow a mine operator to conduct surface mining operations. *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 190–91 (4th Cir. 2009). Other permits may be required to authorize portions of the

operation, if those specific activities are regulated by an independent regulatory program. For example, if a surface mining operation will affect the navigable waters of the United States, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, which aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by eliminating "the discharge of pollutants into the navigable waters." 33 U.S.C. § 1251(a)(1), requires a surface mine operator to obtain various other permits related to the quality of water and wetlands.

For the typical surface mining operation, three different Clean Water Act permits are required. First, a mine operator must obtain a § 401 permit from the proper permitting agency to ensure that "any discharge into the navigable waters" complies with regulations designed to limit the discharge of pollutants into navigable waters and to ensure the maintenance of federal water quality standards. *Id.* § 1341. Second, a mine operator must obtain a § 402 permit for "the discharge of any pollutant, or combination of pollutants." *Id.* § 1342. Finally, and most relevant to the present litigation, a mine operator must also obtain a § 404 permit "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344. This final permit must be obtained from the U.S. Army Corps of Engineers. *See id.* § 1344(d); 33 C.F.R. § 320.2(f).

In conducting its review for a § 404 permit, the Corps is required to comply with guidelines promulgated by the Environmental Protection Agency ("EPA"), which are called the § 404(b)(1) Guidelines. 33 U.S.C. § 1344(b)(1); *see also* 33 C.F.R. § 320.2(f); 40 C.F.R. pt. 230. The review includes the consideration of the health and welfare of those that would be affected by the discharge into jurisdictional waters. For example, under the regulations, the Corps must not issue a permit if the discharge of dredged or fill material would "cause or contribute to significant degradation of the waters of the United States," which may be constituted by certain effects considered individually and collectively, including "[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare" and "[s]ignificantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values." 40 C.F.R. § 230.10(c), (c)(1), (c)(4).

The Corps additionally imposes some general policies that are to be considered in the evaluation of all permit applications, and not only § 404 permits. Under these policies, a decision must include "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest," and "reflect the national concern for both protection and utilization of important resources." 33 C.F.R. § 320.4(a).

In addition to its responsibilities under the Clean Water Act, the Corps must also comply with the requirements of NEPA, 42 U.S.C. § 4321 *et seq.*, which requires federal agencies to "take a 'hard look' at the potential environmental consequences of their actions." *Aracoma Coal*, 556 F.3d at 191 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). NEPA requires federal agencies to prepare a detailed statement, called an environmental impact statement, for every "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.3. When it is not clear whether an environmental impact statement is required, the agency will prepare an environmental assessment, "a concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. §§ 1501.3, 1501.4(b), 1508.9; *see also Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006). If an environmental impact statement is not required, the agency must "[p]repare a finding of no significant impact," 40 C.F.R. § 1501.4(e), that "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared," *id.* § 1508.13. In practice, the environmental assessment generally serves as the finding of no significant impact when an environmental impact statement is not required.

The present action concerns a proposed surface coal mining operation[1] in Perry County, Kentucky, by the intervenor Leeco, Inc. The proposed mining area and the stream beds within it are already environmentally degraded, having been heavily impacted in the past century by previous mining, logging, natural gas exploration, and agricultural activities. The Kentucky Department of Mine Permits authorized the mining operation, and then in early 2007 Leeco submitted an application to the Department of the Army for a permit to authorize the discharge of fill material into stream beds on the project site, as required by § 404 of the Clean Water Act. The Corps issued a public notice for Leeco's application, with a 30-day comment period. This original proposal sought to construct six hollow fills and six sediment control ponds and would have involved discharges into 22,761 linear feet of stream. In the following years, Leeco supplemented and revised its application.

In June 2009 the Department of the Army, the EPA, and the Department of the Interior instituted an interagency action plan intended to "significantly reduce the harmful environmental consequences of Appalachian surface coal mining operations, while ensuring that future mining remains consistent with federal law." Implementing the Interagency Action Plan on Appalachian Surface Coal Mining (June 11, 2009), *available at* http://www.osmre.gov/resources/mou/ASCM061109.pdf. In response to this plan, the EPA conducted a review of Leeco's pending § 404 permit application. The EPA's preliminary assessment concluded that there were "significant concerns that the project, as proposed, does not comply with the [EPA's] 404(b)(1) Guidelines." The EPA

---

[1]The district court accurately described the kind of surface mining to be conducted:

> Surface mining entails the excavation of rock to expose and remove coal seams. Once the coal is extracted, as much as possible of the excavated rock (called "spoil") is returned to the mine site in an attempt to restore natural ground contour. However, because the loosening of the rock and soil and incorporation of air causes the spoil to "swell" to occupy more volume, much cannot be returned to the area where it was blasted. Rather, the spoil is placed in "fills" located in adjacent hollows ("hollow fills" or "valley fills") that, due to the landscape of the Central Appalachian region, often contain headwater streams. . . . [S]urface mining laws require that the drainage from both hollow fills and "mine through" areas pass through sediment control ponds or structures before being discharged into downstream waters. Each of these activities is subject to a series of overlapping permits and certifications involving both federal and state agencies . . . .

*Kentuckians for the Commw. v. U.S. Army Corps of Eng'rs*, No. 3:12-CV-00682, 2013 WL 4516774, at *1 (W.D. Ky. Aug. 23, 2013).

expressed concerns over water quality and mitigation attempts, as well as concern that "the proposed project may have significant human health impacts on the surrounding communities, all of which are low-income communities." In a later letter, the EPA outlined extensive strategies on how to improve the plan.

In response to these concerns from the EPA, Leeco submitted a significantly revised permit application on July 19, 2011. The new application consolidated the fill plan to only one large hollow fill and one sediment control pond. *Id.* The new plan would impact only 18,268 linear feet of streams, a decrease of 4,593 linear feet. *Id.* This later design would all together impact 11,607 linear feet of ephemeral streams (that flow only during periods of heavy precipitation), 5,073 linear feet of intermittent streams (that flow continuously only at certain times of the year, usually because the source, such as melting snow, is seasonal), and 1,588 linear feet of perennial streams (that flow year round). The revised application included a compensatory mitigation plan that would require Leeco to replace 8,376 linear feet of stream in the same watershed area, to compensate for the loss of intermittent and perennial streams. In addition, Leeco agreed to pay the Kentucky Department of Fish and Wildlife Resources $752,047.50 in lieu of mitigation for the impacts on ephemeral streams.

The Corps issued a new public notice on August 5, 2011, with a comment period that lasted through August 19, 2011. During this comment period, the Sierra Club submitted comments objecting to the proposal, and attached studies purporting to demonstrate general health concerns related to surface coal mining. On April 3, 2012, the EPA informed the Corps that it had no further concerns regarding the proposed project, indicating the EPA's approval of the new plan. On May 25, 2012, the Corps completed its review and decision to issue the permit, along with a detailed document discussing its decision. In its decision, the Corps found that "issuance or denial of the requested permit would not constitute a major federal action that would significantly affect the quality of the human environment," and that that determination "constitutes a Finding of No Significant Impact." The Corps finally granted Leeco the § 404 permit on July 26, 2012.

On October 17, 2012, the plaintiffs Kentuckians for the Commonwealth, a grassroots organization devoted to improving the quality of life for the citizens of Kentucky, and the Sierra Club, a national environmental nonprofit organization, filed a complaint against the Corps in the Western District of Kentucky, challenging the issuance of the permit and alleging that it was issued in violation of the Clean Water Act, NEPA, and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* Count One alleged that the Corps had violated NEPA by failing to issue an environmental impact statement, Count Two alleged that the Corps had failed to consider adverse effects on human health and welfare as required by the Clean Water Act § 404(b)(1) Guidelines, Count Three alleged that the Corps had violated its own regulations in failing to properly consider the public interest, and Count Four alleged that the Corps violated the Clean Water Act § 404(b)(1) Guidelines by issuing a permit that will cause or contribute to violations of water quality standards and significant degradation of waters of the United States.

After motions and cross-motions for partial summary judgment, the district court, in a thoroughly reasoned opinion, granted summary judgment in favor of the Corps on all counts, dismissing the suit in its entirety on August 23, 2013. *Kentuckians for the Commw. v. U.S. Army Corps of Eng'rs*, No. 3:12-CV-00682, 2013 WL 4516774, at *21 (W.D. Ky. Aug. 23, 2013). The court first held that the plaintiffs had standing because their members alleged an injury in the form of possible detrimental effects to their health, livelihood, and outdoor recreational pursuits. *Id.* at *8. Regarding the NEPA claim, the court held that the Corps properly limited the scope of review to the filling of jurisdictional waters, because "under SMCRA, it is the [Kentucky Division of Mine Permits], and not the Corps, that has control and responsibility over the Stacy Branch mine site as a whole," and the Corps was otherwise entitled to deference on the scope of review. *Id.* at *10. The court also held that the plaintiffs' comments during the second comment period that cited human health studies did not constitute "significant new information" requiring a supplemental environmental assessment. *Id.* at *12. With reasoning similar to that applied to the NEPA claim, the court held that the Corps properly limited the scope of its review regarding public health under the Clean Water Act § 404(b)(1) Guidelines, and that its environmental justice review under the

Guidelines was not thereby arbitrary and capricious.  *Id.* at *12–13.  In addressing the mitigation claim, the court first expressed doubt that the 2008 regulations pertaining to the assessment of mitigation plans applied to the permit, which was first submitted in 2007.  *Id.* at *14.  The court held that, regardless of whether the 2008 regulations apply, the Corps adequately assessed stream function in its review of the mitigation plan, that it did not act arbitrarily and capriciously in relying on the Eastern Kentucky Stream Assessment Protocol, that it did not act inconsistently with regulations in approving an in-lieu fee payment to a stream-and-mitigation trust fund, and that its analysis of and plan for monitoring stream conductivity were not arbitrary and capricious.  *Id.* at *14–20.

This appeal followed.  On September 9, 2013, the district court issued an injunction pending this appeal.

We review this grant of summary judgment in a challenge to the Corps's permitting decision under the Clean Water Act and NEPA under the Administrative Procedure Act's arbitrary and capricious standard.  *See Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013).  An agency's decision is arbitrary and capricious if the agency has:

> relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)).

"Judicial review of NEPA compliance is limited in scope."  *Id.* (quoting *Cmtys., Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir. 1992)).  Judicial review "ensure[s] that the agency has adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary or capricious."  *Id.* (quoting *Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*, 462 U.S. 87, 97–98 (1983)).  "Because NEPA is a procedural

and not a results-driven statute, even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

On appeal, the plaintiffs have maintained two challenges to the Corps's decision to issue the § 404 permit. First, the plaintiffs argue that the Corps violated NEPA by failing to consider the public health effects of the overall mining activity in conducting its NEPA review of the environmental effects of granting the § 404 permit, especially having considered overall economic benefits of the mining operation. Second, the plaintiffs argue that the Corps violated the Clean Water Act's mitigation requirements by using a flawed analysis to assess the functional effects of the mitigation plan and by failing to substantiate one figure used in the calculation of the mitigation assessment protocol.

First, the Corps did not violate NEPA by deciding not to consider the evidence linking surface coal mining in general to public health problems. In discussing the public health consequences of granting the § 404 permit, the Corps properly focused on the possible public health effects of discharges on the local water supply, as well as those effects caused by air pollution created by the machines that would be conducting permit-relevant site preparation and operations. The Corps reasonably limited its scope of review to the effects proximately caused by the specific activities that were authorized by the permit. Most importantly, the Corps complied with the relevant regulations interpreting and implementing NEPA's requirements.

The Corps did not entirely ignore the public health effects of granting the permit, but rather reasonably limited its scope of analysis only to those human health effects closely related to the discharge of fill or dredged material into jurisdictional stream beds. For example, the Corps assessed the potential impact of the permit activities on the local water supply, and it concluded, in large part because the nearest municipal water supply intake was a significant distance from the operation, that "it is not anticipated that this

proposed project would affect the water supply." Also, the Corps considered the effects of the permit activities on air pollution, concluding that the dust and emissions "will not exceed de minimis levels." This analysis of health effects, albeit not as comprehensive and wide in scope as that demanded by the plaintiffs, was reasonable given the more limited nature of the threshold inquiry of whether the Corps's action significantly affects the human environment.

The Corps acted without abusing its discretion when it determined that the scope of its NEPA analysis should be limited to the local, proximate effects of the dredging and filling activities that were specifically authorized by the permit. The Council on Environmental Quality's regulations grant the Corps some discretion in performing the analysis of whether a federal action is significant enough to warrant an environmental impact statement. With respect to potential health effects, the Council's regulations suggest only that public health effects "*should* be considered," 40 C.F.R. § 1508.27(b) (emphasis added). And when a set of effects is considered, the regulations allow substantial flexibility in delimiting which subsets of effects are relevant. In particular, the context of the federal agency's action should be considered in determining the scope of its relevant effects: "Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." *Id.* § 1508.27(a).

The Corps was not required, as the plaintiffs contend, to expand the scope of its review beyond the effects of the filling and dredging activity to the effects of the entire surface mining operation as a whole. The Corps regulations, the validity of which is not in dispute, govern the Corps's obligations under NEPA. Those regulations state that any NEPA document related to a permit should only "address the impacts of the specific activity requiring a [Corps] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. pt. 325, app. B § 7(b)(1). Here, the overall mining project is not the specific activity authorized by the § 404 permit, nor does the Corps's district engineer maintain

sufficient control and responsibility over other portions of the entire project to warrant federal review.

The specific activity that is the subject of the permit is only the dredging and filling of jurisdictional waters. The Clean Water Act, as only one aspect of a more comprehensive multi-permit regulatory scheme, requires the Corps to provide a § 404 permit only for the "discharge of dredged or fill material into the navigable waters." 33 U.S.C. § 1344(a). The statement accompanying the Corps's NEPA implementing regulations confirms the limited purpose of § 404, stating that "[t]he Corps authorizes the discharge of dredged or fill material in 404 permits" and that, "[t]herefore, the activity the Corps studies in its NEPA document is the discharge of dredged or fill material." Environmental Quality; Procedures for Implementing the National Environmental Policy Act (NEPA), 53 Fed. Reg. 3120, 3121 (Feb. 3, 1988) ("Corps Procedures").[2]

The district court correctly determined that, given the Corps's relatively minor role in the congressionally designed scheme for regulating surface mining, the Corps did not have sufficient control and responsibility over other aspects of the surface mining operation to warrant expanding the scope of its NEPA review. *See Kentuckians*, 2013 WL 4516774, at *10. It is clear that Congress intended SMCRA to create a centralized regulatory program for surface coal mining, and that the Corps's role in the overlapping permitting scheme is secondary, affecting only a small albeit necessary part of the particular surface coal mining operation.

In any case, because the question of the proper scope of analysis in the environmental assessment entails interpretation of the Corps's own regulations, the

---

[2]The plaintiffs argue that the Corps authorized actual surface coal mining, beyond the mere filling of stream beds, because Leeco's permit states that the Corps "authoriz[es] your company's proposal to construct . . . various 'mine throughs.'" This argument misconstrues the specialized language used in the permit and disregards the context in which the permit is granted. As the Corps explained at oral argument, "mining through" is the process of scraping away the surface of an ephemeral stream bed, extracting the coal seams that are then exposed, and refilling the stream bed. The Corps did not authorize mining per se, but only the discharges into streams that are a necessary part of a "mine through." That is, the Corps authorized "mining through" because of the activity's impacts on stream beds and not because of its purpose to extract coal. Furthermore, the Corps does not even have the authority to authorize surface coal mining, and the plaintiffs do not argue that the permit exceeded the scope of § 404.

Corps is entitled to substantial deference with regard to its determination that the district engineer lacked "sufficient control and responsibility" to warrant review of other portions of the entire mining project.[3]   In its decision, the Corps reasoned:

> The NEPA Scope of Analysis in this case would include jurisdictional "waters of the U.S.," and the immediate adjacent riparian corridor that would be filled directly or indirectly by the construction of the Hollowfill, construction of the sediment pond, and the mining through of streams.  A broader scope is not appropriate because the [Clean Water Act] does not provide the Corps legal authority to regulate surface coal mining beyond the limits of the "waters of the U.S."  Rather, overall surface coal mining operations are permitted by and regulated under SMCRA, administered by the Kentucky [Division] of Mine Permits.

This reasoning properly weighed two of the factors that the Corps's regulations use to determine whether there is sufficient control and responsibility to warrant the Corps to expand its scope of analysis to other portions of the state-authorized mining activity: "[t]he extent to which the entire project will be within Corps jurisdiction" and "[t]he extent of cumulative Federal control and responsibility." 33 C.F.R. Pt. 325, App. B § (7)(b)(2)(iii)–(iv).

---

[3]This court must defer to the Corps's interpretations of its own NEPA implementing regulations. *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 193 (4th Cir. 2009).  Courts generally "defer to the agency's interpretation [of its own regulation] unless it is plainly erroneous or inconsistent with the regulation." *Summit Petroleum Corp. v. EPA*, 690 F.3d 733, 740 (6th Cir. 2012) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) (internal quotation marks omitted).  Plaintiffs are correct to point out that *Auer* deference applies only to disputes over the meaning of an agency's own regulation. However, the dispute in this case concerns the interpretation of the Corps's NEPA implementing regulations, in particular how to interpret the terms "specific activity requiring a . . . permit" and "sufficient control and responsibility" in the context of assessing whether NEPA requires an environmental impact statement for the decision to grant a § 404 permit.

It is true that Congress gave the authority to interpret NEPA in a general sense to the Council on Environmental Quality, *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979), which Congress instituted to "consult[] with" agencies to "insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(2)(B).  Pursuant to this mandate, the Council has instituted a number of regulations to help guide federal agencies in executing their NEPA obligations.  However, the Council has also granted agencies significant flexibility in interpreting NEPA's requirements for purposes of conducting their own independent NEPA reviews. *See, e.g.*, 40 C.F.R. § 1507.1.  Indeed, the Council's regulations require federal agencies to, "as necessary, adopt procedures to supplement" the Council's regulations, in particular procedures related to the identification of which actions require an environmental impact statement and which do not, and that such implementing regulations should be adopted after opportunity for public review and review by the Council. *See id.* § 1507.3.

Under instruction from the Council, the Corps has instituted its own regulations to guide its preparation of NEPA-compliant environmental assessments and environmental impact statements. *See* 33 C.F.R. § 230.1; *id.* pt. 325, app. B.  And because the Corps promulgated the specific regulations that govern the question of how great the scope of the Corps's NEPA review is, *see* 40 C.F.R. pt. 1507, the Corps is entitled to deference with respect to the interpretation of those provisions.

The Corps decision in this regard is consistent with the congressional design of both NEPA and the regulatory scheme at issue. Regarding surface coal mining regulation, Congress intended that primary regulatory power be placed in only one agency, in this case the Kentucky Department for Natural Resources. There are many considerations that must be balanced before authorizing a massive and environmentally significant operation, and Congress has determined that such a careful and sensitive decision is best made primarily by one decisionmaker. There are good reasons that Congress would not have designed a regulatory system in which each regulatory actor involved in a large operation, even in a comparatively minor way, is required to consider all of the effects of the overall project.

The restriction of the Corps's scope of analysis is consistent with the congressional policy to give to state governments the primary responsibility to regulate overall surface mining operations. In enacting SMCRA, Congress declared that "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations . . . should rest with the States." 30 U.S.C. § 1201(f); *see also Horizon Coal Corp. v. United States*, 43 F.3d 234, 240 (6th Cir. 1994) (quoting *Save Our Cumberland Mountains, Inc. v. Lujan*, 963 F.2d 1541, 1544 (D.C. Cir. 1992)). The Corps, when it adopted its NEPA-implementing regulations, stated that "in order to prevent the unwarranted situation where 'the Federal tail wags the non-Federal dog', the scope of analysis would be confined to the environmental effects of only the activity requiring a Corps permit." Corps Procedures, 53 Fed. Reg. at 3122. To thwart Kentucky's decision to permit surface mining by permitting the Corps to consider effects of the entire mining operation in its decisionmaking process would violate Congress's intent to place primary responsibility for surface mining with state regulators.[4]

---

[4] The plaintiffs' reliance on 42 U.S.C. § 4332(2)(D) for the assertion that "[t]he Corps cannot rely on Kentucky's overlapping SMCRA jurisdiction to refuse to consider the full environmental impact of a mine it regulates" is misplaced. *See* Appellants' Reply Br. at 7. That statute does not involve the kind of situation presented in this case. That statute only involves a situation in which there is "a major Federal action *funded under a program of grants to States*" and in which the environmental impact statement is "*prepared by a State agency or official*." 42 U.S.C. § 4332(2)(D) (emphasis added). That provision merely "allows a state agency to prepare an [environmental impact statement] for a federal agency if certain conditions are met." *Macht v. Skinner*, 916 F.2d 13, 18 (D.C. Cir. 1990). When NEPA states that

And although "NEPA is a procedural and not a results-driven statute," *Aracoma Coal*, 556 F.3d at 191, adherence to its "procedures [is] almost certain to affect the agency's substantive decision," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). *See also* 40 C.F.R. § 1500.1. It stands to reason that, in the context of a complete regulatory scheme, agencies may reasonably limit their NEPA review to only those effects proximately caused by the actions over which they have regulatory responsibility. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (citing *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 & n.7 (1983)). Moreover, the "rule of reason" recognized by the Supreme Court in *Public Citizen* dictates that agencies make NEPA determinations "based on the usefulness of any new potential information to the decisionmaking process." *Id.* These principles, which support a reasonable delimitation of the proper NEPA scope of review, are effectuated in practice by the Corps's analysis of whether it has "sufficient control and responsibility" over the whole project. *See Aracoma Coal*, 556 F.3d at 196–97; *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1040 (9th Cir. 2009).

The most closely analogous circuit court case, *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), strongly and persuasively supports the Corps's decision to limit its scope of analysis. Like the instant case, *Aracoma Coal* involved the Corps's NEPA obligations during the consideration of a § 404 permit application related to surface mining operations in a state in which the state manages an approved SMCRA regulatory program. *See id.* at 195. Recognizing that "[t]he Corps' jurisdiction under [Clean Water Act] § 404 is limited to the narrow issue of the filling of jurisdictional waters," *id.*, and that "[u]nder SMCRA, the state of West Virginia has 'exclusive jurisdiction over the regulation of surface coal mining and reclamation operations,'" *id.* (quoting 30 U.S.C. § 1253), the Fourth Circuit held that the Corps did not act arbitrarily and capriciously in determining that its scope of review in

---

"[t]he procedures in [§ 4332(2)(D)] shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement," it is referring to the federal official who has delegated NEPA responsibilities to the state-level grantee. *See, e.g.*, *Heeren v. City of Jamestown, Ky.*, 39 F.3d 628, 629 (6th Cir. 1994). Here, there is no grant program and the Corps is not delegating its NEPA responsibility.

issuing a finding of no significant impact did not "extend[] beyond the Corps' limited jurisdiction to include environmental effects on upland areas," *id.* at 197.[5] The court reasoned that "under the plain language of the [Corps' NEPA implementing] regulation, activity beyond the filling of jurisdictional waters is not within the Corps' 'control and responsibility' because upland environmental effects are 'not essentially a product of Corps action." *Id.* (quoting 33 C.F.R. pt. 325, app. B § 7(b)(2)). The plaintiffs in this case argue for an even wider scope of review than that rejected in *Aracoma Coal*. The Fourth Circuit rejected the plaintiffs' argument that "the Corps' § 404 permit is a permit for the entire valley fill, down to the last shovelful of dirt at the edge of the valley," *id.* at 194, while here the plaintiffs argue that the entire mining operation is within the proper scope of the Corps's NEPA review. The reasoning of *Aracoma Coal* precludes such a vast extension of NEPA review.

The plaintiffs incorrectly argue that "[i]f the Corps does not investigate and address these serious health concerns, no agency will." Appellants' Reply Br. at 11. First, the Corps actually did consider public health in its substantive review of the § 404 permit. The EPA, which signed off on the permit and with which the Corps coordinated in reviewing the § 404 permit application's compliance with the Clean Water Act and its associated regulations, specifically addressed concerns that "the proposed project may have significant health impacts on the surrounding communities, all of which are low-income communities."

More importantly, Kentucky's Division of Mine Permits, in complying with the federal standards contained in SMCRA and through is power to impose stricter standards in Kentucky, has the means to address public health concerns associated with surface coal mining. SMCRA is designed in part to "to protect society and the environment from the adverse effects of surface coal mining operations," 30 U.S.C. § 1202(a), through "the establishment of appropriate standards to minimize damage to the

---

[5]The reference to "upland areas" was to parts of the valley outside of the stream beds that would be filled. *See id.* at 186–87. The state SMCRA regulator had authorized the use of "valley fills," while the Corps authorized only the filling of stream beds, which constituted only a portion of the valley to be filled.

environment and to productivity of the soil and to protect the health and safety of the public," *id.* § 1201(d). Kentucky's surface mining permitting program, as required by the comprehensive minimum federal standards, includes extensive regulations designed to minimize the harmful impacts of surface mining activities. This includes requirements to "minimize disturbance of the hydrologic balance in both the permit area and adjacent areas," 405 Ky. Admin. Regs. 16:060 § 1(1), to ensure that "[d]ischarges of water from areas disturbed by surface mining activities shall at all times be in compliance with all applicable federal and state water quality standards," *id.* 16:070 § 1(1)(g), to place excess spoil in designated areas designed to "[m]inimize the adverse effects of leachate and surface water run-off from the fill on surface and ground water," *id.* 16:130 § 1(1)(a), and to "minimize disturbances and adverse impacts on fish, wildlife, and related environmental values, and . . . achieve enhancement of those resources where practicable," *id.* 16:180 § 1(1). Generally, Kentucky's regulatory program maps directly onto the federal minimum requirements established by any regulations passed pursuant to SMCRA. Ky. Rev. Stat. § 350.069. These comprehensive regulations, promulgated by the U.S. Department of the Interior and adopted by Kentucky's Department for Natural Resources, are intended to "strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy." 30 U.S.C. § 1202(f). To the extent that there is scientific evidence establishing that surface mining is generally bad for the public health, the plaintiffs should raise these concerns with those agencies in which Congress has placed the primary responsibility of regulating surface mining, either the federal Office of Surface Mining or the federally approved state regulators.

The plaintiffs also argue that the Corps violated its NEPA regulations by considering the positive economic impacts of the overall mining project without considering the public health impacts of the overall mining operation. This argument fails to take into account that the Corps has other obligations besides its NEPA obligations, and that the final decision document also contains independent (albeit related) analyses required by the Clean Water Act and the Corps's own regulations. Even though the Corps's regulations require a public interest review for all permit

decisions, 33 C.F.R. § 320.4(a), and the § 404(b)(1) Guidelines require the consideration of certain effects on the public interest, *see, e.g.*, 40 C.F.R. § 230.10(c), these are not NEPA obligations.  It is true that for NEPA purposes "the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal."  33 C.F.R. Pt. 325, App. B, § 7(b)(3); *see also* Corps Procedures, 53 Fed. Reg. at 3122 (adopting rule from *Sierra Club v. Siegler*, 695 F.2d 957 (5th Cir. 1983)).  However, the fact that the Corps used a wider scope of review in performing its public interest analysis, as required by the § 404(b)(1) Guidelines and its own regulations, does not mean that the Corps violated its NEPA obligations.  By using one document to serve many functions, the Corps can limit the scope of its review in one part and expand it in another, as each regulatory task requires. For example, the discussions of economic benefits that the plaintiffs point to are contained within sections that discuss alternatives to granting the permit or analyze "human use characteristics," which are relevant to the § 404(b)(1) Guidelines and the Corps's public-interest review.  The plaintiffs' arguments conflate the substantive decision whether to grant a § 404 permit with the procedural requirements under NEPA.

In determining to issue a finding of no significant impact, the Corps performed an environmental assessment, limited in scope pursuant to the Corps's own regulations designed to determine whether a permit decision requires an environmental impact statement. The content of this analysis is rational and appears to be thorough.  That ends the inquiry.  There is no substantive component to NEPA review; this court may only "insist that the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision."  *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 377 (6th Cir. 2010).  The Corps reasonably complied with its own regulations and did not act arbitrarily and capriciously.

With respect to the plaintiff's second claim on appeal, namely that the mitigation plan violates the Clean Water Act, the Corps did not act arbitrarily and capriciously in determining that the compensatory mitigation plan proposed by Leeco in its 2011 permit application complied with the requirements of the § 404(b)(1) Guidelines.

First, the Corps was entitled to rely on the Eastern Kentucky Stream Assessment Protocol ("EKSAP"), which provides for an assessment of functional stream quality in determining whether a mitigation plan sufficiently replaces the aquatic functionality of lost streams. According to the Corps's decision document, the EKSAP is the product of federal and state interagency initiative and is designed to "assess[] the relative quality of a particular headwater stream ecosystem based on observations of regional indicator data concerning its physical[,] . . . chemical[,] . . . and biological . . . characteristics and provides an estimate of the integrity of the system as a whole." The use of this type of metric complies with regulations and is consistent with relatively recent changes in mitigation plan policy. In 2008, the Corps and the EPA passed regulations confirming the validity of—indeed, a preference for—functional metrics designed "to replace lost aquatic resource functions." *See* 33 C.F.R. § 332.3(f)(1); Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19,594, 19,601 (Apr. 10, 2008).[6] The fact that EKSAP uses structural proxies rather than direct measurements of aquatic function is consistent with the new regulations, since the changes in structural conditions rationally relate to improvements in functionality. *See* 33 C.F.R. § 332.3(f)(1). This particular plan employs the "natural channel design" strategy of mitigation, in which habitat structures in the stream will "give support to more species diversity" and a larger riparian buffer zone of vegetation along the stream will "ensure a more productive stream by means of shading and as a food source." And the use of structural proxies that rationally predict aquatic functionality based on objective, measurable structural qualities of the stream satisfies the regulations' command that "[p]erformance standards must be based on attributes that are objective and verifiable." *Id.* § 332.5(b). In the end, given the various interrelated factors and possible assessment metrics that could be used in a mitigation plan, the choice of mitigation performance standards requires the exercise

---

[6]We need not resolve the parties' dispute about whether these 2008 regulations apply to the Leeco permit application. The dispute arose because the original 2007 application would not be covered under the regulations, and there were significant revisions to the application before its final form took shape in 2011. This dispute presents a question requiring the interpretation of interrelated procedural regulations. Ultimately, however, the Corps assessed the application as though the 2008 mitigation regulations applied, and we affirm on that assumption.

of complex scientific judgment and deference to the Corps's expertise is appropriate. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989).

Lastly, the Corps permissibly based its estimation of an eighty-percent likelihood of success on its experience with other mitigation projects. Without any evidence that the Corps's ballpark figure is way off the mark, this court can defer to the expertise of the Corps in fulfilling its requirement to "assess the likelihood for ecological success and sustainability" in evaluating a compensatory mitigation plan. 33 C.F.R. § 332.3(a)(1). The sources cited by the plaintiff do not persuasively demonstrate that the mitigation is likely to be unsuccessful, since the pessimistic assessments of mitigation they cite are from reports over ten years old, which came out before the Corps's adoption of the functional "watershed approach" in 2008. *E.g.*, Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. at 19,594. As further assurance of mitigation success, the possibility of failure in the primary mitigation plan is prepared for in a contingency plan that would be triggered in the circumstance that Leeco does not accomplish the mitigation plan. Moreover, one of the conditions of the mitigation plan is that a certain number of units of functional stream quality "would be held as a contingency against failure of the restoration to reach the predicted EKSAP scores."

In short, the Kentucky Division of Mine Permits, to which Congress has granted exclusive jurisdiction over the regulation of surface mining in Kentucky, approved Leeco's surface mining operation. Meanwhile, the Corps of Engineers granted a secondary permit related only to the filling of jurisdictional waters. The Corps, in light of the entire project's approval under the more comprehensive SMCRA, did not abuse its discretion in limiting the scope of its NEPA review to environmental consequences closely related to the filling of jurisdictional stream beds. Where an existing state regulatory scheme already governs surface coal mining, NEPA does not require the Corps to expand its review to the environmental consequences of the entire mining operation. The Corps also did not abuse its discretion in approving the mitigation plan provisions requiring the improvement of other local streams, since those provisions were

rationally designed to ensure that there is not a net loss of aquatic function in the mine location's watershed.

The district court's judgment is AFFIRMED.