[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10541
_____

D.C. Docket No. 8:17-cv-00618-SDM-MAP


CENTER FOR BIOLOGICAL DIVERSITY,
MANASOTA-88, INC.,
PEOPLE FOR PROTECTING PEACE RIVER, INC.,
SUNCOAST WATERKEEPER,

                                        Plaintiffs - Appellants,

versus

U.S. ARMY CORPS OF ENGINEERS,
TODD T. SEMONITE,
Lt. Gen., in his official capacity as
Commanding General and Chief of Engineers
of the U.S. Army Corps of Engineers,
JASON A. KIRK,
Col., in his official capacity as
District Commander of the U.S. Army Corps of Engineers,
U.S. DEPARTMENT OF THE INTERIOR,
DAVID BERNHARDT,
in his official capacity as
Secretary of the U.S. Department of the Interior, et al.,

                                        Defendants - Appellees,

MOSAIC FERTILIZER, LLC,

Intervenor-Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 4, 2019)

Before ED CARNES, Chief Judge, and MARTIN and ROGERS,* Circuit Judges.

ROGERS, Circuit Judge:

Under the Clean Water Act, the Army Corps of Engineers regulates

discharges into wetlands that are waters of the United States, and must consider the

direct and indirect environmental effects of such discharges before issuing a permit

to discharge.  Mining for phosphate ore (used to make phosphoric acid that is in

turn used to make fertilizer) produces dredged and fill material that Mosaic, a

fertilizer manufacturer engaged in phosphate mining, seeks to discharge into such

wetlands.  The subsequent process of manufacturing fertilizer from the mined

phosphate ore generates a radioactive byproduct, phosphogypsum.  The primary

question in this case is whether the Corps must take into account certain

environmental effects of producing and storing phosphogypsum—distant in time

_____

* Honorable John M. Rogers, United States Circuit Judge for the Sixth Circuit, sitting by
designation.

and place from the wetland discharges accompanying the phosphate mining—merely because phosphogypsum is a byproduct of manufacturing fertilizer from the mined ore.  While it is true that the Corps must consider indirect environmental effects, the Supreme Court has made clear that indirect effects must be proximate, and do not include effects that are insufficiently related to an agency's action. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).  In assessing this proximate cause limitation, the Corps may reasonably take into account the fact that the distantly caused effects in question are subject to independent regulatory schemes.  *Id.*  In granting the discharge permit in this case without addressing the environmental effects of phosphogypsum, the Corps relied in part on the fact that other agencies directly regulate these effects.  Such reasoning in this case by the Corps was not arbitrary, capricious, or an abuse of discretion.  Other bases asserted for rejecting the Corps' discharge permit also lack merit, and the district court accordingly properly upheld the Corps' permit.

## I.

Mosaic wishes to extend its mining operations within the central Florida phosphate mining district.  Mosaic must obtain mining permits from the Florida Department of Environmental Protection ("FDEP"), which, under authority delegated to it by the EPA, issues permits for phosphate mining in Florida, with conditions and requirements regarding pollutant discharge.  *See* 33 U.S.C.

3

§§ 1311(a), 1342(a) (describing the National Pollutant Discharge Elimination System ("NPDES") permit program).  In connection with these planned mining operations, Mosaic seeks to discharge dredged and fill material into waters of the United States.  This activity is subject to regulation under the Clean Water Act, which prohibits the discharge of pollutants into the waters of the United States absent an appropriate permit.  *See id.* § 1344(a).  The Corps has regulatory authority over the applicable permit here, the Section 404 permit, to allow the discharge of dredged or fill material into navigable waters.  *See id.* § 1344.

In 2010 and 2011, Mosaic sought four Section 404 permits under the Clean Water Act to carry out this discharge activity.[1]  The Corps' issuance of a Section 404 permit counts as a major federal action, so the Corps was required to consider the environmental impact of issuing such a permit to Mosaic, which it did.  As documented in its 500-page report, the Corps considered—among many other things—direct effects, such as how the discharge of dredged material into surrounding wetlands might affect the water quality of those wetlands.  *See* 40 C.F.R. § 1508.8(a).  The Corps also considered indirect effects, such as how that discharge might through stormwater runoff be carried to and affect the quality of distant waters.  *Id.* § 1508.8(b).

---

[1] Mosaic's predecessor, CF Industries, applied for the permit at issue.  Mosaic and CF later merged.  We refer to the combined entity as Mosaic throughout for convenience.

Because the Corps' action constitutes a major federal action, the Corps must also comply with the National Environmental Policy Act ("NEPA"). NEPA requires federal agencies to "take a 'hard look' at the potential environmental consequences of their actions." *Ohio Valley Envt'l Coal v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Under NEPA, agencies are required to produce environmental-impact statements that account for the direct, indirect, and cumulative effects of major proposed actions. Direct effects are "caused by the action and occur at the same time and place"; indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. By "reasonably foreseeable," the regulations mean effects that are "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision." *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (quoting *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016)).

The Corps determined that Mosaic's four mining-related projects had similarities that provided a basis for evaluating their environmental consequences together in one area-wide environmental-impact statement. The area-wide environmental-impact statement served as the project-specific NEPA analysis for each of the four permit applications. In 2016, the Corps published a draft Section

5

404 analysis and public-interest review for one of the proposed projects, the South Pasture Mine Extension.  In doing so, the Corps also prepared a supplemental environmental assessment focusing on the South Pasture Mine Extension, to be read in conjunction with the area-wide environmental-impact statement for purposes of NEPA.  In connection with the proposed Section 404 permit for the South Pasture Mine Extension, the Corps formally consulted with the Fish and Wildlife Service to obtain a biological opinion analyzing the potential effects that the mine extension would have on certain species.  Ultimately, in November 2016, the Corps issued Mosaic a Section 404 permit for the South Pasture Mine Extension.

Accordingly, Mosaic will be able to discharge dredged and fill material into the waters of the United States in connection with mining phosphate at the South Pasture Mine Extension for subsequent use in fertilizer production.  Phosphate mining is a form of strip mining.  After excavating the sand, clay, and phosphate ore from the site, Mosaic engages in a beneficiation process to separate the sand and clay from the valuable phosphate ore.  The phosphate ore is then transported to Mosaic's fertilizer plants for processing into phosphoric acid.  Phosphoric acid in turn is used to produce fertilizer.  But the process of producing phosphoric acid generates waste in the form of phosphogypsum, a radioactive byproduct.  Approximately five tons of phosphogypsum waste is created for every ton of

6

useful phosphoric acid produced, for a total of over 30 million tons generated each year. Because phosphogypsum contains radioactive uranium and other metals that the EPA considers to pose a risk to humans and the environment, it must be stored and left to "weather" (reduce in radioactivity) in large open-air "stacks" that are hundreds of acres wide and hundreds of feet tall. The Corps determined that the environmental effects of phosphogypsum production and storage fell outside the scope of its NEPA review. This led Bio Diversity to file suit.

Bio Diversity's complaint raises several claims under the Administrative Procedure Act ("APA"), NEPA, and the Endangered Species Act. The Corps moved for and was granted summary judgment. The district court found that there was nothing arbitrary and capricious about the Corps' determination that phosphogypsum stacks fell outside the scope of its NEPA analysis. Rather, the district court found that the Corps rationally treated fertilizer plants and their phosphogypsum waste as independent from the mining activities authorized by the Section 404 permit. The district court also approved the Corps' decision to analyze all four closely related projects in a single area-wide environmental-impact statement for NEPA purposes. Finally, the court rejected Bio Diversity's claim under the Endangered Species Act that the Corps was required to consult with the Fish and Wildlife Service before finalizing the area-wide environmental-impact statement. Bio Diversity appeals.

7

## II.

As the district court properly determined, it was reasonable for the Corps to conclude that the environmental effects of phosphogypsum production and storage fell outside the scope of its NEPA review. NEPA and its regulations require agencies to consider only those effects caused by the agency's action, but phosphogypsum-related effects are caused by the Corps' Section 404 permit in only the most attenuated sense. In traditional legal terms, even if the Corps' permit is a but-for cause of those effects, it is not a proximate—or legally relevant—cause. Moreover, because the Corps lacks the authority to regulate phosphogypsum wholesale, the "rule of reason" instructs that the Corps need not consider its effects. Finally, the Corps' scoping decision is consistent with its own regulations, the Corps' interpretation of which is entitled to deference.

NEPA requires agencies to consider the "environmental impact of the proposed action." 42 U.S.C. § 4332(C)(i). Here, the Corps' action is the issuance of a Section 404 permit authorizing the discharge of dredged and fill material into United States waters. The Corps did not issue a mining permit, nor a permit to produce fertilizer or to store phosphogypsum—it has no jurisdiction to regulate or authorize any of that. Having defined the federal action, "[t]o determine whether [NEPA] requires consideration of a particular effect, [the court] must look at the relationship between that effect and the change in the physical environment caused

8

by the major federal action at issue." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983). Only the effects caused by that change in the environment—here, the discharge into U.S. waters—is relevant under NEPA.

Phosphogypsum-related effects are, at most, tenuously caused by the discharge of dredged and fill material allowed by the Corps' permit. Phosphogypsum is a byproduct not of dredging and filling—nor even of phosphate mining or beneficiation—but of fertilizer production. Further, the fertilizer production takes place far from and long after the Corps-permitted discharges. Further still, the EPA and the FDEP—not the Corps—directly regulate fertilizer plants and phosphogypsum, including the "design, construction, operation, and maintenance of phosphogypsum stack systems." *See* 42 U.S.C. § 6901 *et seq*. Mosaic's fertilizer production will add to existing gypstacks, as they are called, but will not result in any new stacks. Even the nearest fertilizer plants and gypstacks to the South Pasture Mine Extension receive phosphate rock from many different sources outside of the Corps' jurisdiction. That means that gypstacks and the effects of phosphogypsum will continue to exist so long as, and to the extent that, Florida and the EPA allow—regardless of the Corps' permitting decision.

Bio Diversity focuses on what it deems a but-for causal relationship between the Corps' permit and the production of phosphogypsum. That relationship focuses on the fact that Mosaic's fertilizer plants, which produce phosphogypsum,

9

receive phosphate ore from local mines the company also owns. Bio Diversity therefore contends that "but for" the Corps' Section 404 permit, phosphogypsum's environmental effects would be diminished because Mosaic would not be able to obtain as much phosphate, thereby reducing its fertilizer (and phosphogypsum byproduct) production, if it could not discharge dredged and fill material into U.S. waters, which necessarily accompanies Mosaic's phosphate mining here. But the happenstance that Mosaic is the company mining the phosphate and discharging dredged and fill material into U.S. waters, and also the company running the fertilizer plant that produces phosphogypsum, does not change the fact that these events are insufficiently related to one another. NEPA does not stretch this far.

NEPA does not cover all "effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation." *Metro. Edison Co.*, 460 U.S. at 774. Instead, NEPA requires a "reasonably close causal relationship between a change in the physical environment and the effect at issue," akin to the "familiar doctrine of proximate cause." *See id.* Agencies and courts must "look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Id.* at 774 n.7. The Corps reasonably determined that its Section 404 permit is not a proximate cause of attenuated phosphogypsum-related

10

effects, and the competing line suggested by Bio Diversity is anything but manageable.

Whatever causal relationship exists between the Corps-approved discharges and the effects of phosphogypsum, it is not a reasonably close one. Phosphogypsum is created and stored miles from the authorized discharges. In addition, phosphogypsum will only be created so long as Mosaic continues to operate in the fertilizer industry, the market continues to demand fertilizer with phosphoric acid, and phosphogypsum's regulators continue to permit its creation and storage throughout Florida. Intervening events such as these ordinarily break the causal chain.

Given this tenuous causal chain, it was sensible for the Corps to draw the line at the reaches of its own jurisdiction, leaving the effects of phosphogypsum to phosphogypsum's regulators. The Corps' line respects the jurisdictional boundaries set by Congress and inherent in state–federal cooperation. The Clean Water Act empowers the Corps to grant Section 404 permits to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by regulating "the discharge of pollutants into the navigable waters." 33 U.S.C. § 1251(a)(1). No federal law empowers the Corps to protect the environment writ large or to regulate phosphate mining as such, much less fertilizer production or phosphogypsum stacking. Whatever federal regulatory powers there are over

11

phosphogypsum-related effects, Congress granted to the EPA, leaving the bulk of control over phosphate mining and fertilizer production to the states. *See* 42 U.S.C. § 6901 *et seq.* Requiring the Corps to enter those regulatory spheres not only offends congressional design but risks duplicative, incongruous, and unwise regulation. Because the Corps does not generally regulate phosphogypsum, it has no subject-matter expertise in that area.

"The scope of the agency's inquiries must remain manageable if NEPA's goal of 'ensur[ing] a fully informed and well considered decision' is to be accomplished." *Metro. Edison Co.*, 460 U.S. at 776 (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)). Far from manageable, the new inquiries required of the Corps would bog down agency action in the name of duplicative and potentially incoherent regulation.

The Corps' decision not to consider phosphogypsum-related effects is fully justified by the rule of reason announced in *Public Citizen*. 541 U.S. at 767. The rule of reason "ensures that agencies determine whether and to what extent to prepare an [environmental-impact statement] based on the usefulness of any new potential information to the decisionmaking process." *Id.* Thus, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Id.* at 770.

12

The Corps has no categorical statutory authority under the Clean Water Act to prevent phosphogypsum-related effects apart from the possibility that they are direct, indirect, or cumulative effects of the discharges into U.S. waters.  This supports the Corps' decision not to consider those effects.  Section 404 of that Act authorizes the Corps to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  That section further authorizes the Corps to reject such a permit "whenever [it] determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."  *Id.* § 1344(c).  The Corps has no categorical power to refuse a permit for any other reason, such as its dislike of the applicant's business or downstream effects not sufficiently caused by "the discharge of such materials."  The Corps accordingly properly relied upon the fact that phosphogypsum-related effects are primarily regulated by other agencies in its determination not to consider those effects, and did so without violating NEPA.

This makes good sense in light of the existing regulatory landscape over phosphogypsum.  Mosaic and others already produce fertilizer in Florida, and gypstacks will exist in Florida regardless of the Corps' actions.  Thus, current and future phosphogypsum will cause environmental effects with or without the Corps'

13

permit—subject only to regulation by Florida and the EPA. On the flip side, Florida or the EPA could regulate those gypstacks out of existence even if the Corps were to grant Mosaic its Section 404 permit. Requiring the Corps to consider the effects of phosphogypsum is not reasonable when it is independent of the regulators more directly responsible for evaluating those effects.

Further, that the Corps could indirectly mitigate future phosphogypsum-related effects by conditioning the supply of phosphate ore does not mean the Corps must consider wielding its regulatory powers with that ulterior motive in mind. The rule of reason turns, at least in part, on the agency's statutory authority, not on what outcomes an agency might achieve through indirect coercion. If the Corps were required to consider all effects that it might indirectly police—even those far from its proper sphere of regulatory authority—its NEPA review would have to account for every conceivable environmental effect of fertilizer's use. It is foreseeable, for instance, that farmers will use Mosaic's fertilizer to treat their crops and that some fertilizer will be carried by stormwater runoff into sewers and streams. Extending Bio Diversity's logic, because the Corps could indirectly mitigate those effects by denying Mosaic its Section 404 permit and thereby choking its fertilizer plants of phosphate, the Corps must consider the environmental effects of crop fertilization. That cannot be right.

14

*Public Citizen* flatly held that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." 541 U.S. at 770. There, an agency within the Department of Transportation was tasked with setting federal safety standards and registration requirements for Mexican-domiciled commercial vehicles operating in the United States. *See id.* at 758–59. In earlier years, Congress had enacted a moratorium on the agency's registration of Mexican-domiciled motor carriers. Eventually, Congress and the President agreed to lift the moratorium—but only after the agency promulgated new safety and registration rules. *See id.* at 760. In the course of that rulemaking, the agency conducted a NEPA analysis of the environmental effects of its proposed rules, such as the effects on air quality caused by the increased number of roadside inspections its new rules would bring about. *See id.* at 761. An environmental group sued, contending that the agency was required to consider the environmental effects of the increased number of Mexican-domiciled motor carriers operating within the U.S. because of the lifting of the moratorium. That was necessary, according to the environmental group, because the agency's rulemaking was a but-for cause of the lifting of the moratorium. *See id.* at 765–66.

Despite this "but for" relationship between the agency's rulemaking and the lifting of the moratorium, the Supreme Court held that NEPA did not require the

15

agency to consider effects that it "ha[d] no ability categorically to prevent." *See id.* at 768. That followed because the rule of reason recognizes that it is pointless to require agencies to consider information they have no power to act on, or effects they have no power to prevent. In *Public Citizen*, the agency had the statutory authority only to promulgate safety and regulation standards—not to keep the moratorium in place or modify its lifting, which only Congress and the President could do.

That rule applies in much the same way here. The Corps has no ability categorically to prevent fertilizer production or the creation and storage of phosphogypsum. As in *Public Citizen*, it is irrelevant that the Corps' action is, in an attenuated way, a but-for cause of phosphogypsum production, because Florida and the EPA have primary authority to regulate or prevent phosphogypsum's creation and storage. Thus, here too it would be pointless to require the Corps to gather and examine information regarding effects that it has no authority to prevent.

It is true that the agency in *Public Citizen* had no discretion to refuse registration (absent the moratorium) to a motor carrier that complied with its regulations. But that is beside the point. Individual registration was not at issue; rulemaking was, and the agency did have discretion to set safety and registration standards. The Supreme Court rejected the idea that the agency could indirectly

16

mitigate the environmental effects of lifting the moratorium by (i) not promulgating any new rules or (ii) setting burdensome standards so that fewer motor carriers could meet them and operate in the U.S. *See id.* at 765–68. The Court held that it was not enough that the agency could, in fact, mitigate those effects, when the agency was not statutorily authorized to base its decision on those ancillary effects. *See id.* The same is true here: The Corps could, in fact, mitigate the effects of phosphogypsum by rejecting the Section 404 permit and choking off Mosaic's supply of phosphate ore. But the Corps is not statutorily authorized to base its permitting decision on environmental effects that are so indirectly caused by its action.

The Corps could conceivably hinge its permitting decision on the effects of phosphogypsum, but only by ignoring the Clean Water Act's text and misapplying its implementing regulations. The Clean Water Act does not give the Corps the discretion to deny a Section 404 permit for any reason of its choosing. Although the first subsection of § 1344 says the Corps "may issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites," 33 U.S.C. § 1344(a), the Act also provides that the Corps

> is authorized to deny or restrict the use of any defined area for specification . . . as a disposal site [i.e., deny a permit], whenever [it] determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.

17

*Id.* § 1344(c).  Read together, those provisions limit the Corps' discretion to grant or issue permits.  The Corps may not deny a permit for any reason under the sun—including its distaste for later conduct the applicant will engage in—but only if the allowed *discharge* will directly, indirectly, or cumulatively have an unacceptable environmental effect.  And the scope of that analysis is bounded by proximate cause and the rule of reason.  Because the Corps cannot deny a permit because of phosphogypsum effects, which are beyond the scope of § 1344(c), the Corps was not required to consider those effects.  *See Pub. Citizen*, 541 U.S. at 767–68.  Thus, as in *Public Citizen*, the Corps' Section 404 permit for the discharge of dredged material is not a proximate cause of the effects of Mosaic's fertilizer production, and such effects need not be considered under NEPA.

The same is true under the Clean Water Act's implementing regulations.  Those regulations require the Corps to conduct a public-interest review before granting a permit, but that obligation is not an authorization to deny a permit based on the environmental impacts of non-agency action.  In the first place, regulations cannot contradict their animating statutes or manufacture additional agency power.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125–26 (2000); *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134–35 (1936).  Because the statute authorizes the Corps to deny a permit only if the discharge itself will have an unacceptable environmental impact, the

18

regulations cannot empower the Corps to deny permits for any other reason—including downstream phosphogypsum-related effects of fertilizer production.

The regulations also focus the Corps' review on the effects of its action.  The regulations provide that "[t]he decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, *of the proposed activity and its intended use* on the public interest."  33 C.F.R. § 320.4(a)(1) (emphasis added).  Again, the "proposed activity" is the proposed federal action that triggers NEPA—here, the issuance of the discharge permit.  Obligating the Corps to consider whether the discharge of dredged and fill material is in the public interest, is not the same as authorizing the Corps to consider whether fertilizer production and its consequences are in the public interest.

To take an alternative, unbounded view of the public-interest review would be to appoint the Corps de facto environmental-policy czar.  Rather than consider whether the Corps' own action is in the public interest, that broader view would have the Corps consider whether fertilizer production and use is really worth the cost.  And that could be just the beginning.  The next time the Corps is asked to approve a section of a gas pipeline running through a wetland, would the Corps be required to consider whether the country's reliance on fossil fuels is really in the public interest?

19

The D.C. Circuit's outlier opinion in *Sabal Trail* provides little support for Bio Diversity's argument. *See Sierra Club v. FERC* (*Sabal Trail*), 867 F.3d 1357 (D.C. Cir. 2017). There, FERC authorized the construction and operation of a pipeline network that would feed gas directly to power plants that would burn the gas. *See id.* at 1363. The Sierra Club sued and argued that FERC failed to consider the greenhouse-gas effects of burning that gas at the power plants. The D.C. Circuit, over a powerful dissent, held that FERC was required to consider those downstream environmental effects.

*Sabal Trail* is both questionable and distinguishable. First, the causal relationship between the agency action and the putative downstream effect was much closer there than it is here. FERC authorized a pipeline that would pump gas directly into a power plant to be burned, causing greenhouse-gas emissions. The Corps, on the other hand, approved only the discharge of dredged and fill material—one small piece of Mosaic's mining operations, which extracts a sand, clay, and phosphate ore mixture, which is supplied to beneficiation plants where the phosphate ore is separated out, which is then transported to fertilizer plants to make phosphoric acid, which results in phosphogypsyum byproduct, and the phosphoric acid is used to produce fertilizer. The phosphogypsum produced as a byproduct when phosphate ore is processed into phosphoric acid is only then stored around the state of Florida and liable to produce environmental effects.

20

That articulated causal chain bears little resemblance to the two-link version in *Sabal Trail*.

Second, the scope of the agency's statutory authority in *Sabal Trail* was much broader than the Corps' here, and the rule of reason hinges, in any given case, on the scope of the agency's statutory authority because an agency need not consider an effect it has no statutory authority to prevent. *See Pub. Citizen*, 541 U.S. at 770. In *Sabal Trail*, FERC was statutorily empowered to deny a pipeline certificate on the ground that its construction and operation "is [not] required by the present or future public convenience and necessity." *See* 15 U.S.C. § 717f(e). The *Sabal Trail* court understood that to mean "FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment." *See Sabal Trail*, 867 F.3d at 1373. But here, as discussed, the Corps has no broad statutory authority to deny a discharge permit based on the public convenience and necessity of the operation of Mosaic's fertilizer plants. *See* 33 U.S.C. § 1344(c).

Third, *Sabal Trail* is at odds with earlier D.C. Circuit cases correctly holding that "the occurrence of a downstream environmental effect, contingent upon the issuance of a license from another agency with the sole authority to authorize the source of those downstream effects, cannot be attributed to the [agency]; its actions 'cannot be considered a legally relevant cause of the effect for NEPA purposes.'"

21

*Sabal Trail*, 867 F.3d at 1381 (Brown, J., concurring in part and dissenting in part) (quoting *Sierra Club v. FERC* (*Freeport*), 827 F.3d 36, 47 (D.C. Cir. 2016) and citing *Sierra Club v. FERC* (*Sabine Pass*), 827 F.3d 59, 68 (D.C. Cir. 2016) and *EarthReports, Inc. v. FERC*, 828 F.3d 949, 952 (D.C. Cir. 2016)).

Fourth, the legal analysis in *Sabal Trail* is questionable at best.  It fails to take seriously the rule of reason announced in *Public Citizen* or to account for the untenable consequences of its decision.  The *Sabal Trail* court narrowly focused on the reasonable foreseeability of the downstream effects, as understood colloquially, while breezing past other statutory limits and precedents—such as *Metropolitan* and *Public Citizen*—clarifying what effects are cognizable under NEPA.  *See id.* at 1380–81.

Under the rule of reason, agencies are not required to consider effects that they lack the statutory authority categorically to prevent.  Here, the Corps lacks the authority categorically to prevent the effects of downstream fertilizer production, including those from phosphogypsum's creation and storage.  Thus, the Corps acted reasonably in deciding not to consider those effects.

Finally, the Corps' decision is consistent also with the Corps' own regulations.  At the very least, the regulations are ambiguous as to their exact application in this case.  That means we are in the heartland of *Auer* deference: where "the law runs out, and policy-laden choice is what is left over."  *See Kisor v.*

*Wilkie*, 139 S. Ct. 2400, 2415 (2019).  Because the Corps tailored its analysis according to a reasonable interpretation of its own regulations and its own substantive expertise, the Corps' interpretation should be deferred to.  *See id.* at 2414–18; *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Aracoma*, 556 F.3d at 177.

The Corps' regulations anticipate that a permit applicant "may propose to conduct a specific activity requiring a [Corps permit] (e.g., construction of a pier in a navigable water of the United States) which is merely one component of a larger project (e.g., construction of an oil refinery on an upland area)."  33 C.F.R. pt. 325, app. B § 7(b)(1).  That is what happened here: Mosaic proposed to discharge dredged and fill material into U.S. waters as merely one component of its larger mining operation.  In those circumstances, the regulations provide that the Corps "should establish the scope of the NEPA document (e.g., the [Environmental Assessment] or [Environmental Impact Statement]) to address the *impacts of the specific activity requiring a [Corps] permit* and those portions of the entire project over which the [Corps] has sufficient control and responsibility to warrant Federal review."  *See id.* (emphasis added).  If that guidance were not clear enough, the statement accompanying the regulation is: "The Corps authorizes the discharge of dredged or fill material in 404 permits.  Therefore, the activity the Corps studies in its NEPA document is the discharge of dredged or fill material."  *Environmental*

*Quality Procedures for Implementing the National Environmental Policy Act (NEPA)*, 53 Fed. Reg. 3120, 3121 (Feb. 3, 1988). The Corps was required to study more only if it had "sufficient control and responsibility" over those other effects.

It was not arbitrary and capricious for the Corps to conclude that it did not have "sufficient control and responsibility" over Mosaic's downstream fertilizer production. Those plants already exist; they are not a part of Mosaic's proposed mining expansion. The plants and gypstacks are many miles away from where Mosaic would discharge into U.S. waters. Moreover, two other regulators—one state, one federal—have express control and responsibility over fertilizer production and phosphogypsum.

The hypotheticals included in the regulations squarely support the Corps' determination. For example, when a power plant is proposed to be built and the Corps' only involvement is to approve a connecting pipeline or road through U.S. waters, that permit "normally would not constitute sufficient" control and responsibility to expand the Corps' NEPA analysis to cover the portions of the facility outside its jurisdictional waters. *See* 33 C.F.R. pt. 325, app. B § 7(b)(3). The reasonableness of the Corps' decision here follows *a fortiori* from there. In that hypothetical, the Corps approved a pipeline or road that ran directly to the proposed power plant. Despite that close connection, the regulations did not extend control over the facility. Here, the relationship is nowhere near that close.

24

The scope of the benefit of a project cannot, moreover, always define the scope of the agency's consideration.  It is true that, under the regulations, "the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal."  *See id.* § 7(b)(3).  But this cannot mean that whenever an agency determination will help the local economy, for instance, it is required to consider whether the proposed activity may put some other employers out of business.  Here, the argument is that the Corps violated § 7(b)(3) by including in its report that one "substantial indirect effect of the mining" is the "export of finished phosphate products and fertilizer through the Port of Tampa each year."  The Corps was not, however, trying to have its cake and eat it too—it properly balanced the benefits of the project against its detriments.  In doing so, it recognized that the overall project purpose was the extraction of phosphate ore within a practicable distance of Mosaic's beneficiation plants.  It makes no sense to expand the required scope of the Corps' environmental consideration merely because the Corps explained why phosphate ore is mined in the first place—largely to be converted into phosphoric acid and used in fertilizer.

The obvious purpose of § 7(b)(3) is to prevent the Corps from unfairly carving a project (over which it has control) into thin slices and then balancing the benefits of the overall project against the watered-down environmental impacts of

25

each individual slice—in order to avoid a true study of the overall impacts. *Florida Wildlife Federation v. U.S. Army Corps of Engineers* shows how this works in action. 401 F. Supp. 2d 1298 (S.D. Fla. 2005). There, Palm Beach County made plans to build a research park, the development of which would require discharges into U.S. waters. The County applied for a Section 404 permit, but only in relation to one subdivision of the research park; it asked the Corps to evaluate that one subdivision independently from the much larger planned development, which would also require Section 404 permits. *See id.* at 1305. The Corps acquiesced and considered the environmental impacts of the subdivision alone. Yet, it balanced those minor negative impacts against the great benefits of the entire planned research park. *See id.* at 1332–33. By stacking the deck in that way, the Corps was able to justify, on paper, its conclusion that the permit would have no significant impact and thus avoid having to prepare an environmental-impact statement at all. Following the admonition in the regulations, the court held that it was not proper to use a narrower scope for the effects analysis than for the benefits analysis. That case illustrates the import of § 7(b)(3), but this case is nothing like that one. Eschewing an evaluation of the effects of building a house by evaluating each piece of lumber one at a time is obviously different from evaluating the effects proximately caused by that construction without following the chain of causation to the ends of the earth.

In contrast, the regulations provide, by way of an example, that when the Corps approves only a portion of a pipeline feeding gas to a power plant, the Corps is generally not required to consider the impacts of the power plant's operation. *See* 33 C.F.R. pt. 325, app. B § 7(b)(3). But that conclusion cannot logically depend on the Corps' never mentioning in its impact statement that the pipeline's purpose is to feed gas to the power plant. If that were correct, how would the Corps explain the project or consider its public benefit without having to consider all manner of downstream effects way beyond the reasonable scope of required consideration?

At bottom, the Corps followed its own regulations in determining the scope of the NEPA analysis as it did. The Corps' reasonable interpretation should be deferred to. *See Kisor*, 139 S. Ct. at 2414–18.

Our sister circuits have ruled similarly. *See Aracoma*, 556 F.3d at 177; *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698 (6th Cir. 2014). In these cases, the Corps approved Section 404 permits in connection with mining operations. In each, an environmental group argued that the Corps failed to take account of the downstream environmental effects of mining. In each, the court held that NEPA did not require consideration of those effects.

In *Aracoma*, the Fourth Circuit appreciated both that "obtaining a § 404 permit is a 'small but necessary' component of the overall upland [mining] project," and that this fact alone did not give the Corps control and responsibility over the entire mining project. *See Aracoma*, 556 F.3d at 195. Looking to *Public Citizen*, and the state's regulation of coal mining, the court held that "under the plain language of the [Corps'] regulation, activity beyond the filling of jurisdictional waters is not within the Corps' 'control and responsibility' because upland environmental effects are 'not essentially a product of Corps action.'" *Id.* at 196–97 (citing 33 C.F.R. pt. 325, app. B § 7(b)(2) (2008)). The court added that, even were it to credit the environmental group's arguments, it "must still deem the regulation 'ambiguous,' and the Corps' interpretation would be entitled to deference." *See id.* at 197.

In *Kentuckians*, the Sixth Circuit applied more or less the same analysis in holding that the Corps was not required "to expand the scope of its review beyond the effects of the filling and dredging activity to the effects of the entire surface mining operation as a whole." *See* 746 F.3d at 707. Again, the court held that the Corps' determination was a reasonable interpretation of those regulations and entitled to deference. *See id.* at 707–08, 714. It added that the Corps' interpretation and determination "effectuated in practice" the principles underlying

28

the proximate-cause doctrine and rule of reason announced in *Metropolitan* and *Public Citizen*. *See id.* at 710.

These cases are not different merely because they dealt with coal mining rather than phosphate mining. Although it is true that Congress fleshed out in more detail the balance between federal and state regulatory control over coal mining, that same balance functionally exists in the context of phosphate mining. Florida has authority over phosphate mining, and the Corps has authority only over U.S. waters. *Public Citizen* and the Corps' regulations focus on the Corps' authority; that authority is the same here as it was in *Aracoma* and *Kentuckians*.

In short, requiring an analysis of the environmental effects of gypstacks in the context of this case expands NEPA's environmental consideration in an unwieldy and indefensible way. Taken to its logical conclusion, that view would expand consideration of the effects of dredging certain wetlands to require study of the environmental effects of far-flung activity like the use of fertilization in commercial farming.

**III.**

The Corps otherwise complied with NEPA by issuing an area-wide environmental-impact statement, which served as the mine-specific impact statement for each of the four proposed mine sites, and following that up with a supplemental environmental assessment of the South Pasture Mine Extension,

29

before issuing the Section 404 permit related to that mine in a record of decision. Bio Diversity claims that this process skirted NEPA's implementing regulations and that the Corps was required to publish an additional impact statement for the South Pasture Mine Extension because of alleged new circumstances. Those claims are without merit.

Agencies have broad discretion to determine "how best to handle related, yet discrete, issues in terms of procedures and priorities." *Grunewald v. Jarvis*, 776 F.3d 893, 905 (D.C. Cir. 2015). The NEPA regulations specifically allow— indeed, encourage—agencies to consider "[s]imilar actions" together in one environmental-impact statement where the actions "have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R § 1508.25(a)(3). The Corps here determined that the four proposed mining-related projects were "similar in geographic coverage, the periods of proposed activity, alternatives, and impacts." Thus, it was reasonable for the Corps to conclude that "[t]hese shared characteristics provide an additional basis for evaluating their environmental consequences in a single comprehensive [area-wide] EIS [environmental-impact statement]."

As Bio Diversity agrees, after the Corps prepared an impact statement to evaluate the environmental impacts of issuing the permit, it was required to publish a record of its decision, at the time of its decision. 33 C.F.R. § 230.14; 40 C.F.R.

30

§ 1505.2. The Corps did not err by preparing in the interim a supplemental environmental assessment specific to the South Pasture Mine Extension to assist with its permit decision and confirm that its area-wide impact statement was not outdated. The NEPA regulations expressly allow for a "broad environmental impact statement" followed by a "subsequent statement or environmental assessment," which need only summarize and incorporate those earlier discussions by reference. *See* 40 C.F.R. § 1502.20. Indeed, Bio Diversity concedes that the Corps may undertake a "tiered" process, in which case "it must follow the broader—here 'area wide'—EIS [environmental-impact statement] with a subsequent site-specific review that at a minimum ensures the agency address all relevant matters not considered in a previous EIS, and analyzes and substantively considers new or changed circumstances that bear on the proposed action or its impacts." That is precisely what the Corps did here.

Bio Diversity argues also that—even if procedurally proper—the supplemental environmental assessment was substantively insufficient because it (1) did not analyze substantial changes or significant new circumstances that arose after the Corps finalized the area-wide impact statement, (2) identified impacts in the area-wide impact statement which were left for but never analyzed in the supplemental assessment, and (3) never analyzed the impacts of digging out 409 acres of the Payne Creek watershed.

31

As to the purported new circumstances that went unanalyzed between the area-wide impact statement and the supplemental assessment, Bio Diversity points to: (i) changes in ownership of the mine, (ii) revisions to the project design and permit application, (iii) changes to the timing and duration of the mining plan, and (iv) changes to the compensatory mitigation plan. NEPA requires that an impact statement be supplemented if "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R § 1502.9. Read in light of the "rule of reason," additional information need only be accounted for if the information would have been useful to the agency's decisionmaking process. *See Pub. Citizen*, 541 U.S. at 767. That is to say, the Corps "need not supplement an EIS [environmental-impact statement] every time new information comes to light after the EIS is finalized," as doing so "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *See Marsh v. Or. Nat'l. Res. Council*, 490 U.S. 360, 373 (1989).

None of the purportedly changed circumstances is significant or would otherwise affect the Corps' decisionmaking process.

32

*Ownership*.  The Corps persuasively argues that Mosaic's acquisition of CF Industries' Florida phosphate operations is of no significance to the environmental impacts of the project, because any owner must comply with the same terms of the permit.  The Corps directly acknowledged the change of ownership in the supplemental assessment and explained that it "did not change the basic or overall purposes for [the] project."

*Timing*.  Bio Diversity claims that inconsistencies in the stated timing of the project between the area-wide statement and supplemental assessment require additional analysis.  But, as the Corps explains, there is no material inconsistency.  In the area-wide statement, the Corps estimated that mining would take place over thirteen years; whereas, in the supplemental assessment it approximated fourteen years.  Bio Diversity has not explained how these slightly different estimates have any bearing on the Corps' NEPA analysis.

*Revisions to Application*.  The only significant revisions to the permit applications that Bio Diversity identifies support, rather than undermine, the Corps' decision to prepare a supplemental assessment rather than an entirely new impact statement.  The changes resulted in *less* extensive environmental impacts than originally envisioned.  An agency is generally not required to conduct a new environmental analysis when changes result in less harmful environmental effects than originally anticipated.  *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360

(11th Cir. 2008). In any event, the Corps considered the changes and invited public comment before issuing its supplemental assessment.

*Mitigation Plan.* Without offering any specific criticism, Bio Diversity claims that a supplemental statement was required because of significant changes to the compensatory mitigation plan. But, as the Corps explains, the area-wide statement contemplated changes to the mitigation plan for each specific mine, based on review and modification of the applicants' suggested plans in coordination with the EPA. Because these plans are necessarily site-specific, it was reasonable for the Corps to verify and set out the final mitigation plan in the record of decision specific to the South Pasture Mine Extension.

Second, Bio Diversity argues that the Corps failed to meaningfully discuss its mitigation analysis, but Bio Diversity fails to provide support for that assertion. The area-wide statement includes an entire chapter on mitigation, and the Corps is entitled to rely on its own expertise in drawing conclusions within its wheelhouse. Bio Diversity cannot prove an actionable claim under NEPA and the APA by asserting baldly that the Corps' analysis was not meaningful.

Third, Bio Diversity argues that the Corps failed to analyze the effects of mining 409 acres within the Payne Creek watershed. But the Corps expressly relied on its expertise in determining that, given Payne Creek's size and history, "mining this relatively small percentage of the overall subwatershed would [not]

34

have a measurable additional effect on flows within the subwatershed." As Bio Diversity concedes, only significant effects of a proposed action need be analyzed. Thus, Bio Diversity fails to show that the Corps acted arbitrarily and capriciously in determining that mining within the Payne Creek would have little if any measurable effect and need not be analyzed further.

## IV.

Finally, the Corps did not violate § 7(a)(2) of the Endangered Species Act, which requires each agency to consult with the Fish and Wildlife Service before taking an "action" to ensure that such action is not likely to jeopardize the continued existence of any endangered species or its habitat. *See* 16 U.S.C. § 1536(a)(2). The term "action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including the granting of permits or causing indirect modifications to land. *See* 50 C.F.R. § 402.02. Bio Diversity does not dispute that the Corps consulted with the Service and obtained a biological opinion concerning its decision to issue a Section 404 permit for the South Pasture Mine Extension. Rather, Bio Diversity argues that completing the area-wide environmental-impact statement constituted an "agency action"—separate from the permitting decision—that required its own formal consultation under the Act.

The Corps' area-wide statement did not, however, constitute an "agency action" that required consultation with the Service independent of the Corps' later issuance of the Section 404 permit.  An impact statement is the culmination of an agency's NEPA analysis, which is performed in furtherance of some other agency action, here the issuance of a permit.  It makes no sense to say the NEPA analysis constitutes an agency action separate and apart from the action that triggers that review in the first place.

Bio Diversity's attempts to characterize the area-wide impact statement as a programmatic agency action are not persuasive.  To be sure, an agency's establishment of a program, which binds, funds, or directs subsequent action may constitute an "agency action."  For instance, in *Florida Key Deer v. Paulison*, this court held that the Federal Emergency Management Agency's administration of the National Flood Insurance Program was an agency action that triggered § 7(a)(2) review because it set a framework that would direct future land management decisions and thus "effectively authoriz[ed] . . . development that pushed the Key deer to the brink of extinction."  522 F.3d 1133, 1139 (11th Cir. 2008).  Similarly, in *Cottonwood* the Ninth Circuit held that the Forest Service's promulgation of standards for permitting activities that could adversely affect Canada lynx qualified as an agency action under the Endangered Species Act.  *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1085 (9th Cir.

36

2015). These cases, and the others cited by Bio Diversity, hold that setting guidelines to direct or cabin future agency action may constitute a programmatic action that triggers consultation under § 7(a)(2).

But the area-wide impact here did nothing of the sort—it did not direct or authorize the Corps' substantive decision to issue the Section 404 permit under the Clean Water Act or otherwise bind the agency to take any future action. It merely disclosed the Corps' environmental analysis of four proposed permitting actions (each one of which would require its own § 7(a)(2) consultation). Thus, the Corps' area-wide environmental-impact statement did not constitute an "agency action" that required consultation under § 7(a)(2) of the Endangered Species Act.

## V.

For these reasons, the judgment of the district court is affirmed.

MARTIN, Circuit Judge, concurring in part and dissenting in part:

Piles of a radioactive waste product called phosphogypsum lie across 3,200 acres in Bone Valley, Florida. To date, over 1 billion tons of phosphogypsum loom over the flat Floridian landscape. These mountains of waste are a monument to the lasting environmental impact of Florida's phosphate fertilizer industry.

The land in Bone Valley is rich in phosphate. Mosaic, a fertilizer manufacturer, mines 17.1 million tons of phosphate there each year. Mosaic turns this phosphate into fertilizer at four Mosaic fertilizer plants, also located in Bone Valley.

This process generates more hazardous waste than it does fertilizer. The making of one ton of fertilizer-ready phosphate leaves five tons of phosphogypsum byproduct behind. Phosphogypsum has no beneficial use, so Mosaic heaps it in massive outdoor "stacks." These stacks are often built on top of old phosphate mines and wherever else Mosaic owns "unused" land in Bone Valley. To dispose of phosphogypsum, Mosaic pumps gallons of phosphogypsum-water "slurry" into huge reservoirs on top of the stacks. Over time, this slurry hardens into a crust, raising the stack and its basin for wastewater. A fully grown stack is as big as a square mile and as tall as 300 feet high.

In the past 30 years, there have been five "major" spills of phosphogypsum-tainted water from stacks in Bone Valley. Tens of millions of gallons of

38

phosphogypsum-tainted wastewater have gushed into local rivers, creeks, wetlands, and aquifers. In 1997, a phosphogypsum spill into Florida's Alafia River poisoned 42 miles of its water, killing more than one million baitfish and shellfish, 72,900 gamefish, and 377 acres of trees and vegetation.[1]

I dissent today because I believe the Army Corps of Engineers had a duty to consider the environmental impact of Mosaic's phosphogypsum stacks before it granted a permit needed for Mosaic to mine phosphate. Otherwise, I readily join parts III and IV of the majority opinion. The majority correctly concludes that the Army Corps of Engineers ("the Corps") consulted with the Fish and Wildlife Service, as required by the Endangered Species Act. I also agree with the majority that the Corps did not violate the National Environmental Policy Act ("NEPA") when it declined to publish a separate environmental impact statement for the South Pasture Mine Extension.

However, I believe the Corps' environmental impact statement violates NEPA. As a result, I would sustain the challenge to that document. NEPA requires federal agencies to consider indirect environmental effects of major actions. *See* 42 U.S.C. § 4332; 40 C.F.R. § 1508.8(b). Indirect effects are those that are "reasonably foreseeable." 40 C.F.R. § 1508.8(b). This record makes quite

---

[1] *See* Craig Pittman, *The Clock is Ticking on Florida's Mountains of Hazardous Phosphate Waste*, Sarasota Magazine, Apr. 26, 2017, https://www.sarasotamagazine.com/articles/2017/4/26/florida-phosphate.

clear that it was more than reasonably foreseeable that granting a permit under section 404 of the Clean Water Act to Mosaic would result in the creation of more phosphogypsum. Mosaic told the Corps it needed the § 404 permit to mine phosphate for its fertilizer plant. And again, every single ton of fertilizer-ready phosphate sourced from Mosaic's mines produces five tons of radioactive phosphogypsum. Thus, it is undeniable that issuing a permit to Mosaic's phosphate mine would add to the stacks of phosphogypsum already piled high across central Florida. Yet, the Corps did not consider phosphogypsum as an indirect effect in the environmental impact statement at issue here.

I view the Corps' reasons for failing to consider phosphogypsum as an indirect effect as arbitrary and capricious. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377, 109 S. Ct. 1851, 1861 (1989). In order to hold otherwise, the majority opinion turns a blind eye to the record here, and expands upon the argument actually made by the Corps. I part ways with the majority opinion on four points. First, this record makes clear that phosphogypsum production was a reasonably foreseeable effect of the § 404 permit that enabled Mosaic to mine phosphate for fertilizer. Second, the Corps violated its own NEPA procedures when it considered the benefits of fertilizer manufacturing without considering its environmental impacts, including the production of radioactive phosphogypsum. Third, other agencies' oversight of phosphogypsum did not relieve the Corps of its

40

obligation to consider the environmental effects. Finally, the Corps has underlying statutory authority to consider phosphogypsum as an indirect effect under NEPA.

### I.

The majority opinion is mistaken in concluding that the production of phosphogypsum was not a reasonably foreseeable consequence of granting Mosaic a § 404 Clean Water Act permit, and thus not an "indirect effect" the Corps needed to consider under NEPA. Maj. Op. at 7–10. Aside from being at odds with the record before us, this conclusion could allow agencies to avoid their obligations to address important environmental impacts on projects within their jurisdiction.

To begin, the majority opinion glosses over whether the Corps could reasonably foresee production of phosphogypsum. It first reasons that "fertilizer production takes place far from and long after" Mosaic uses its § 404 permit to mine phosphate. Maj. Op. at 8. But this is exactly how NEPA defines "indirect effects." Indirect effects are "caused by the action and are later in time or farther removed in distance," but still "reasonably foreseeable." *See* 40 C.F.R. § 1508.8(b) (defining indirect effects). The fact that phosphogypsum production occurs after the phosphate has been mined and in a different place does not mean it is not a reasonably foreseeable indirect effect.

Beyond that, the record shows that Mosaic's entire operation—from phosphate mining, to beneficiation, to production of phosphoric acid and

41

phosphogypsum—takes place right in Bone Valley. Granted, Mosaic owns tens of thousands of acres in Bone Valley. But the extraordinary scale on which Mosaic produces fertilizer makes its production of phosphogypsum more foreseeable, not less.

The majority opinion hypothesizes about the fertilizer market, the regulatory landscape, and Mosaic's business plans. *See* Maj. Op. at 10. It predicts that changes in the wider world could distance phosphogypsum from Mosaic's phosphate mining. It supposes that because phosphogypsum stacks would exist without Mosaic producing phosphogypsum, the stacks should not be considered as environmental effects. *See* Maj. Op. at 12. But these hypothesized facts cannot properly relieve the Corps of its obligation to consider environmental effects altogether. For example, the Corps should surely consider environmental effects on fish when a river is dredged and filled, even if those fish might also exist in different waters or if dredging and filling operations ongoing elsewhere would harm them.

The majority opinion is forced to reason based on hypothetical facts because the actual facts cannot support its conclusion. There is overwhelming evidence, acknowledged by the Corps—but not referenced in the majority opinion—that Mosaic would produce millions of tons of phosphogypsum byproduct as a result of the dredging and filling permit for its phosphate mine. The operation of this

phosphate mine clearly results in the production of phosphogypsum.  Indeed, this fact is more than reasonably foreseeable.  It is obvious and certain.

The record undermines the majority opinion's theories that Mosaic's phosphate mining was separate from its fertilizer production.  In Mosaic's initial application for a permit, it plainly told the Corps that it would have to "cease operations" at its fertilizer plant "unless it is able to acquire economically viable phosphate rock from some unknown future source in order to continue operating it."  It continued: "Mining existing reserves [in Florida] is the only viable long-term solution to meeting this need" for phosphate ore.  When Mosaic amended its application some time later, it again acknowledged its dependence on mining to continue its fertilizer production operations.  As for the possibility of running the fertilizer plants on imported phosphate, Mosaic's applications made clear that this would not work long-term.  Importing phosphate "does not," as Mosaic explained, "provide for a predictable business model or allow for evaluation of risk, as [Mosaic] would have no control of the essential raw material needed for phosphate fertilizer production."  As a result, Mosaic said importing rock "is neither reasonable nor practicable" from a business standpoint.

Mosaic told the Corps that its fertilizer plants "would not be able to compete in the phosphate crop nutrient market if they were required to pay for imported phosphate rock."  Mosaic explicitly tied its ability to mine to the permit it was

43

seeking: "the viability of the remaining four [fertilizer plants] is dependent upon the ability to continue phosphate ore mining and phosphate rock production . . . , which in turn depends on issuance of the pending 404 Permit applications."

Thus, Mosaic's own words belie the conjecture in the majority opinion that Mosaic might stop producing fertilizer with the phosphate it mined. Mosaic's words also deflate the idea that it would not need to mine phosphate, using the § 404 permit, in order to produce fertilizer. Certainly, this record shows that it was at least reasonably foreseeable to the Corps that granting a permit to Mosaic would result in production of phosphogypsum from Mosaic's fertilizer plants. The Corps' decision to ignore the environmental effects of phosphogypsum based on the idea that it did not foreseeably result from granting Mosaic a § 404 permit is simply not supported.

## II.

Beyond running counter to the record evidence, the Corps' decision not to account for the indirect effects of phosphogypsum violated its own regulations. The Corps' environmental impact statement sang the praises of the fertilizer industry as a reason to award Mosaic a § 404 permit, yet it failed to consider the industry's known environmental impacts—like phosphogypsum. This, despite the Corps' own regulations that require it to weigh both the benefits and impacts of fertilizer manufacturing equally, without placing its thumb on the scale.

44

The Corps has regulations implementing its NEPA responsibilities. *See* 33 C.F.R. pt. 325, app. B. Those regulations establish certain procedures for considering the environmental effects of granting permits. And these procedures require the Corps "[i]n all cases" to use the same "scope of analysis" for "analyzing both impacts and alternatives" as for "analyzing the benefits of a proposal." 33 C.F.R. pt. 325, app. B(7)(b)(3) (emphasis added). This requirement thus dictates how the Corps must frame the scope of its analysis when making environmental impact statements. *See* 40 C.F.R. § 1508.25 (defining the scope of analysis for environmental impact statements); 33 C.F.R. pt. 325, app. B(7)(b).

The Corps' NEPA implementation procedures require it to conduct an environmental analysis for portions of the project "over which the [Corps] has sufficient control and responsibility to warrant Federal review." 33 C.F.R. pt. 325, app. B(7)(b)(1), (2). The procedures offer several examples of what this means. *Id.* app. B(7)(b)(3). For example, the implementation procedures say the Corps need not do a NEPA review of the effects of an electric plant if the only Clean Water Act permit necessary for the project relates solely to a "fill road," and the electric plant will not otherwise impact United States waters. *Id.* B(7)(b)(3). The admonition to use the same scope of analysis for impacts and benefits in all cases follows these examples. *Id.* I understand this admonition to qualify what's come before. *See, e.g.*, *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010)

45

(interpreting words "in a manner consistent with their plain meaning and context"). The regulations thus call for the Corps to use a broader scope of review for environmental impacts whenever it uses that same broader scope of review for benefits. This is so even if its regulations would not otherwise require consideration of those impacts.

The Corps was required to consider phosphogypsum here. It framed the public benefits of the phosphate mine in terms of its importance to fertilizer production. It noted that nearly all the phosphate rock mined in the United States—more than 95% of it, to be precise—is used to make wet phosphoric acid, which has phosphogypsum as a byproduct. And it factored in economic impacts on the phosphate industry far removed from mining as part of the public's need for the project. For example, as one "substantial indirect effect of the mining," the Corps pointed to benefits related to "the export of finished phosphate products and fertilizer through the Port of Tampa each year, [which] contribut[e] significantly to making the port the state's largest in tonnage shipped and about the 10th largest in the nation."

The majority opinion concludes the Corps did not violate its own regulations because it simply "explained why phosphate ore is mined in the first place." Maj. Op. at 24. But the Corps went much further: it analyzed the economic benefits of fertilizer production as an indirect effect of granting Mosaic a § 404 permit. Yet in

46

the same document it refused to analyze the impact of phosphogypsum, a byproduct of the fertilizer, as an indirect effect. The NEPA implementation regulations do not allow the Corps to have it both ways. That is, it cannot consider the broad downstream economic benefits of mining and fertilizer production, and then ignore the environmental impacts associated with those benefits. Its own regulations require it to do more. *See* 33 C.F.R. pt. 325, app. B(7)(b).

The majority opinion says it defers to the Corps' decision to overlook phosphogypsum as an interpretation of its own regulations. However, the Corps itself gave no official interpretation of its own regulations that would warrant this deference. *See Auer v. Robbins*, 519 U.S. 452, 461, 117 S. Ct. 905, 911 (1997) (holding that an agency's interpretation of its own regulations is "controlling" unless "plainly erroneous or inconsistent with the regulation" (quotation marks omitted)). Without an agency interpretation, not even one offered "in the form of a legal brief," *see id.* at 462, 117 S. Ct. at 912, the Corps' failure to analyze environmental impacts of fertilizer manufacturing does not merit deference.

The majority opinion goes on to insist that the Corps did not exercise "sufficient control and responsibility" over Mosaic's manufacturing of phosphate-based fertilizer, so the Corps did not have to consider any effects of fertilizer production. Maj. Op. at 21–27. I agree the Corps is not required to analyze the impacts of activities over which it lacks "sufficient control and responsibility."

47

But it must home its analysis in on the "specific activity requiring a" permit.  33 C.F.R. pt. 325, app. B(7)(b)(1).  And it is not free to disregard the impacts of activities over which it has no control when it chooses to count the benefits of those same activities.  This required balance effectuates NEPA's purpose of ensuring informed decision-making.  *See Marsh*, 490 U.S. at 371, 109 S. Ct. at 1858.  The majority's approach, which allows consideration of endless benefits without concomitant consideration of the impacts associated with those benefits, thwarts this purpose.

In short, this record does not support the majority's conclusion that the Corps followed its own procedures.  The Corps did not do its job when it failed to consider phosphogypsum as an indirect environmental effect of Mosaic's § 404 permit.

## III.

The majority opinion not only sanctions the Corps' wayward decision to overlook phosphogypsum's environmental effects for the reason that fertilizer production was somehow unforeseeable.  The opinion also holds that the Corps could not have considered phosphogypsum because it altogether lacked the statutory authority to do so.  Maj. Op. at 12–18.  But this exceeds any disclaimer the Corps made on its own behalf.  Instead, the Corps initially said it did not consider phosphogypsum because other state and federal agencies regulate it and

48

those agencies therefore more directly cause the environmental effects of phosphogypsum.

Thus, when the majority opinion holds that the Corps had no statutory authority at all to consider phosphogypsum, it transforms the argument made by the Corps, and at the same time deals a blow to NEPA. I discuss each aspect of the majority opinion in turn.

A.

The Corps decided it need not account for environmental effects of phosphogypsum because other agencies more directly regulated these environmental effects. As I understand it, the Corps is assigning responsibility for the effects of pollution not to the polluter, but to other agencies that regulate the polluter. The idea is that the manner in which other agencies regulate the polluter ultimately delivers the pollution. But this notion ignores the Corps' own responsibility to monitor and regulate polluters. And the fact that other agencies have regulatory responsibilities in this area does not mean the Corps is relieved of its own duties. *See Sierra Club v. Fed. Energy Regulatory Comm'n* ("*Sabal Trail*"), 867 F.3d 1357, 1375 (D.C. Cir. 2017) ("[T]he existence of permit requirements overseen by another federal agency or state permitting authority cannot substitute for a proper NEPA analysis."). NEPA requires the Corps to answer the question of whether some downstream impact should count as an

indirect effect, and the answer turns on whether it is "reasonably foreseeable." 40 C.F.R. § 1508.8(b). Another agency's jurisdiction over an effect does not make the effect unforeseeable. *Cf. Sabal Trail*, 867 F.3d at 1375.

The majority opinion concludes "the existing regulatory landscape over phosphogypsum," overseen by the EPA and the state of Florida, sets phosphogypsum out of the Corps' reach. Maj. Op. at 12. But this conclusion puts NEPA entirely out of business. Given our robust "administrative state with its reams of regulations," there will always be another agency regulating a potential environmental harm. *See Alden v. Maine*, 527 U.S. 706, 807, 119 S. Ct. 2240, 2291 (1999) (Souter, J., dissenting). NEPA does not ask agencies to consider only novel environmental effects that are not otherwise addressed by the administrative state. NEPA requires agencies to consider direct, indirect, and cumulative environmental effects, full stop. *See* 40 C.F.R. §§ 1508.7, 1508.8.

The majority relies on *Department of Transportation v. Public Citizen*, 541 U.S. 752, 124 S. Ct. 2204 (2004), and *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), to support its conclusion that Florida and the EPA's regulation of phosphogypsum means it is not a foreseeable environmental effect that the Corps must consider. *See* Maj. Op. at 13–17, 26–28. These cases do not support this conclusion. *Public Citizen* and *Aracoma Coal* address unique factual contexts that implicate federalism and constitutional

50

presidential power.  Those facts are not at issue in our more run-of-the-mill case here.

*Public Citizen* held that the Federal Motor Carrier Safety Administration ("FMCSA") did not violate NEPA when it did not consider the environmental effects of the President's decision to honor treaty obligations and allow Mexican motor carriers into the United States.  541 U.S. at 766, 773, 124 S. Ct. at 2214, 2218.  The North American Free Trade Agreement ("NAFTA") required the United States to admit trucks from Mexico, despite American concerns that those trucks were unsafely regulated.  *Id.* at 759–60, 124 S. Ct. at 2211.  To comply with NAFTA, the President directed the FMCSA to set new safety standards and admit Mexican trucks that met those standards.  *Id.* at 760, 124 S. Ct. at 2211.  *Public Citizen* thus addressed the circumstance in which the decision whether to admit Mexican trucks was entirely out of the FMCSA's control.  *Id.* at 772–73, 124 S. Ct. at 2218.  Even if the FMCSA considered the environmental impacts of allowing trucks from Mexico, this data could not have changed its duty to comply with NAFTA and the President's order to admit the trucks.  *See id.* at 768, 124 S. Ct. at 2216.

*Public Citizen* does not control here.  The EPA and the state of Florida's primary oversight of phosphogypsum stacks is a far cry from the unilateral authority a president has to enter into binding treaties.  Also, in contrast to the

51

FMCSA, the Corps is charged with undertaking a public-interest review of § 404 permits and it enjoys discretion to grant or deny those permits based on environmental concerns.  *See* 33 C.F.R. § 320.4(a) (prescribing public-interest review of permits issued by the Corps); *Sabal Trail*, 867 F.3d at 1380 (Brown, J., concurring in part and dissenting in part) (concluding *Public Citizen* does not apply where the agency has "broad discretion" under public-interest review to account for environmental impacts).  The Corps is empowered to deny § 404 permits if it determines the permit's impact on "general environmental concerns," "water quality," or "the needs and welfare of the people" would be against "the public interest."  33 C.F.R. § 320.4.  The power of the FMCSA to deny entry to Mexican motor carriers for environmental reasons had been bargained away by treaty.  *See Public Citizen*, 541 U.S. at 770, 124 S. Ct. at 2217.  In contrast, the Corps has the power to, and must, consider environmental effects when issuing Clean Water Act permits.

Neither does *Aracoma Coal* support the majority's holding.  In *Aracoma Coal*, the Fourth Circuit held that NEPA did not require the Corps to assess the environmental impact of a mining project seeking a § 404 permit to fill stream waters.  556 F.3d at 197.  The court was faced with reconciling NEPA and the Surface Mining Control and Reclamation Act of 1977, a federal statute that gave states "exclusive jurisdiction over the regulation of surface coal mining and

52

reclamation operations on non-Federal lands . . . ." *Id.* at 189 (quotation marks omitted).  Thus, *Aracoma Coal* addressed an "environmental review process that has already been delegated to federally approved state programs."  *Id.* at 196.  We do not address a program under the Surface Mining Act here, and Florida does not have "exclusive jurisdiction" to regulate phosphogypsum.[2]  *See id.* at 195.

To the contrary, here there is no comprehensive scheme of state regulation that would remove the Corps' power to consider broad environmental effects of phosphate mining, fertilizer production, and phosphogypsum.  As it must, the majority opinion recognizes that Florida <u>and</u> the EPA regulate phosphogypsum concurrently.  Maj. Op. at 15.  Thus, the Corps would not trample on a careful federalist balance, like the one addressed in *Aracoma Coal*, by considering the environmental impact of phosphogypsum.

Neither *Public Citizen* nor the mere fact that another agency has jurisdiction changes the reality that Mosaic's phosphate mine will create more phosphogypsum to feed the existing stacks in Bone Valley.  The Corps' refusal to analyze

---

[2] The majority also relies on *Kentuckians for the Commonwealth v. U.S. Army Corps of Engineers*, 746 F.3d 698 (6th Cir. 2014), authored by our visiting colleague on his home court. *See id.* at 701; Maj. Op. at 26–27.  Like *Aracoma Coal*, *Kentuckians* does not bear on this case. *Kentuckians* holds that NEPA did not require the Corps to consider the environmental impact of a surface mining project.  *See* 746 F.3d at 709, 713–14.  Like *Aracoma Coal*, the *Kentuckians* decision hinged on the federalist balance struck in the Surface Mining Act.  *See id.* at 713 ("Congress has granted exclusive jurisdiction over the regulation of surface mining [to] Kentucky . . . .  The Corps, in light of the entire project's approval under the more comprehensive [Surface Mining Act], did not abuse its discretion in limiting the scope of its NEPA review.").

phosphogypsum as an indirect effect cannot be excused by other agencies' ability to oversee it.

### B.

I now turn to the majority's conclusion that the Corps altogether lacked statutory authority to consider phosphogypsum as an indirect effect of enabling Mosaic's phosphate mining. *See* Maj. Op. at 12–18. To start, this holding provides an explanation for the Corps' actions that the Corps did not give itself. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983) ("We may not supply a reasoned basis for the agency's action that the agency itself has not given." (quotation marks omitted)). But setting aside that the Corps did not advance the argument made in the majority opinion, the argument cannot withstand scrutiny in any event.

The majority says the Clean Water Act allows the Corps to deny a § 404 permit for one reason only: environmental effects from dredged and fill material discharged into U.S. waters. Maj. Op at 12, 16–17 (citing 33 U.S.C. § 1344(c) (giving the Corps authority over § 404 permits)). To arrive at this conclusion, the majority relies on *Public Citizen*'s holding that an agency is not required to consider environmental effects where the agency "has no ability to prevent a certain effect due to its limited statutory authority." 541 U.S. at 770, 124 S. Ct. at 2217. Thus the majority opinion reasons that since the Corps could not deny a

54

§ 404 permit for any reason other than dredging and filling, it did not have to consider any environmental effects beyond dredging and filling. Maj. Op. at 16–17. This logic continues: phosphogypsum is not a dredged and fill material discharged into U.S. waters, so the Corps had no statutory authority to consider its environmental effects. Maj. Op. at 15–16.

Again, I reject this justification. Certainly, the Corps has authority to consider the environmental effects of phosphogypsum. It can even deny dredging and filling permits based on the production of phosphogypsum. That is because the implementing regulations of the Clean Water Act give the Corps the power to deny a dredging and filling permit when potential impacts on "general environmental concerns," "water supply and conservation," and "water quality" outweigh "[t]he benefits which reasonably may be expected to accrue" from the proposed activity. 33 C.F.R. § 320.4(a)(1) (guiding the Corps' "decision whether to issue a permit"). This record shows that radioactive phosphogypsum stacks tower above Florida water sources, and these stacks have spilled waste into the surrounding waters. Production of more phosphogypsum is a clearly foreseeable result of Mosaic's phosphate mining and fertilizer operation. The Corps should have assessed the environmental impact that leaky phosphogypsum stacks might have on U.S. waters and the environment at large before granting Mosaic its permit.

I fear the majority's holding does damage to the Clean Water Act's implementing regulations.  In support of its conclusion, the majority opinion says these implementing regulations improperly "manufacture additional agency power."  Maj. Op. at 17.  Despite the clear statement in the regulations that the "decision whether to issue a permit will be based on" factors like "conservation" and "general environmental concerns," *see* 33 C.F.R. § 320.4(a)(1), the majority says this regulation does not empower the Corps to deny a permit for general environmental reasons.  This cannot be right.

Even if I were to accept the majority's premise that the Corps' authority to issue § 404 permits under the Clean Water Act must turn only on considerations of dredging and filling, *see* Maj. Op. at 16, the text of the Clean Water Act still requires the Corps to give a "hard look" under NEPA to the broader effects of the dredging.  "Courts have consistently held that the Corps' NEPA obligations when issuing a § 404 dredge and fill permit . . . extend beyond consideration of the effects of the discharge of dredged or fill material in jurisdictional waters." *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1063 (10th Cir. 2015) (McHugh, J., concurring); *see also O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 232–34 (5th Cir. 2007) (holding that NEPA required the Corps to consider the environmental effects of increased auto traffic when authorizing dredging and filling to construct a residential subdivision); *Save Our Sonoran, Inc. v. Flowers*,

56

408 F.3d 1113, 1118, 1122 (9th Cir. 2005) (holding the Corps must consider the environmental impact of an entire residential subdivision before granting a permit to fill natural waterways running through the subdivision).  Simply put, "[a]lthough the Corps' permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project. . . . The Corps' responsibility under NEPA to consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all." Sonoran, 406 F.3d at 1122.

Requiring the Corps to consider the environmental implications of the underlying project benefited by dredging and filling is true to NEPA and the realities of our "human environment."  *See* 42 U.S.C. § 4332(C) (explaining agencies' NEPA obligations).  Considering the entire project preserves NEPA's "information-forcing" purpose by airing the environmental consequences of the entire endeavor.  *See Sabal Trail*, 867 F.3d at 1367.  This approach recognizes that environmental consequences do not occur in a vacuum.  *See, e.g.*, Erin E. Prahler et al., *It All Adds Up: Enhancing Ocean Health by Improving Cumulative Impacts Analyses in Environmental Review Documents*, 33 Stan. Envtl. L.J. 351, 354 (2014) ("The environmental effects caused by human activities do not occur independently of one another.").  And evaluating the entire project is consistent

57

with the Corps' authority to issue permits "based on an evaluation of the probable impacts . . . of the proposed [dredging and filling] activity <u>and its intended use</u> on the public interest."  *See* 33 C.F.R. § 320.4(a)(1) (emphasis added).  As the record clearly shows, Mosaic intended to use its § 404 permit to mine phosphate for fertilizer.  The Corps had the authority to consider the environmental effects that emanate from this permit.

## IV.

This Court is duty-bound to enforce NEPA when an agency strays from it. *See Sabal Trail*, 867 F.3d at 1367–68.  I do not believe the Corps honored its obligations under NEPA.  Because none of the reasons the Corps gave for excluding consideration of phosphogypsum comply with NEPA, I would invalidate the environmental impact statement and send it back to the Corps to prepare a new one.  The Corps should have articulated a NEPA-compliant reason for excluding phosphogypsum from consideration or else considered it as an indirect effect.  I respectfully dissent.